260 S.W.2d 472 (1953)
LINDSEY
v.
WILLIAMS.
No. 43236.
Supreme Court of Missouri, Division No. 1.
July 13, 1953.
Rehearing Denied September 14, 1953.
Neale, Newman, Bradshaw, Freeman & Neale, Jean Paul Bradshaw, Springfield, Mo., Walter S. Pettit, Jr., Springfield, for appellant.
Glenn A. Burkart, Frank C. Mann, Mann, Mann, Walter & Powell, Springfield, for respondent.
HOLLINGSWORTH, Judge.
This is an action for damages for personal injuries sustained by Verna Helen Lindsey, a minor, while riding as a guest in an automobile owned by defendant, Hollis Williams, and operated by one Mary Savage under defendant's immediate supervision. The suit was instituted by Verna's father, Burney J. Lindsey, as her natural guardian and next friend. Upon trial in the Circuit Court of Greene County, she recovered a verdict for $15,000 and judgment was rendered accordingly. Defendant's motion to set saide the judgment or in the alternative for a new trial was overruled upon condition plaintiff remit $6,000 of the judgment, with which she refused to comply. On May 21, 1952, the trial court sustained the motion for new trial on the sole ground the verdict was excessive. On May 23, 1952, Verna's father filed a motion in the trial court reciting that Verna had died on May 22nd, that he was the administrator of her estate, and praying that he be substituted as party plaintiff, which motion the court sustained. Thereupon, Burney J. Lindsey, administrator, as the duly substitued plaintiff, appealed to this court. For convenience, we will continue to refer to Verna Lindsey as plaintiff and to Hollis Williams as defendant.
The amount of the judgment set aside by the trial court and the amount sought in *473 the petition ($15,000) being in excess of $7,500, this court has jurisdiction.
In this court, the defendant, in addition to defending the action of the trial court in holding the verdict excessive, also urges: (a) that the trial court should have sustained his motion to set asise the judgment upon the ground that plaintiff's evidence tended to prove specific negligence, whereas, the action was pleaded and submitted under the res ipsa loquitur doctrine; or, in the alternative, (b) that the trial court should have granted him a new trial because of error in overruling his last application for continuance based upon his absence from the trial due to military service.
On the night of May 13, 1950, plaintiff, then sixteen years of age, was employed as a car-waitress at Atlee's Drive-In Restaurant situate on South Glenstone Road, in the City of Springfield, Missouri. On that night she had a date to meet Willard Phillips after her work ended. About midnight, Phillips, accompanied by three other young men, including defendant, and three girls, including Mary Savage, came to Atlee's Drive-In in defendant's car, a two-door 1941 Chevrolet. Plaintiff got into the car and sat on the left side of the rear seat. Next to her, in the rear seat, sat Willard Phillips, to his right sat Rose Savage and on the extreme right sat Wilbur Williams. In the front seat, Mary Savage sat under the wheel, defendant sat in the center next to Mary, and Linford Cloyd sat on the right of defendant. Plaintiff knew all of those present. It was decided that they would drive a short distance south on Glenstone Road to get something to eat. The party, with Mary Savage driving, proceeded southward on Glenstone Road, at a speed of 30 to 35 miles an hour. There were few, if any, other cars on the highway. After they had gone one or two miles, they had reached and were proceeding along a straight stretch of roadway which there extended in an easterly and westerly direction. The car began to swerve, left the travelled portion of the roadway, crossed the shoulder and an adjacent ditch, crashed through a fence and collided head-on with a tree. Plaintiff was thrown from the car and sustained severe injuries, the extent of which will be more fully hereinafter detailed. There were no intoxicants drunk on the trip nor were there any in the car and none had been drunk by any of the parties prior to the trip.
State Highway Patrolman Francis E. Stephens arrived at the scene of the wreck within about fifteen minutes after it occurred. He found plaintiff lying at the side of the car suffering from a comminuted fracture of her right leg, with the bones protruding from the flesh. Glenstone Road is paved with "blacktop". For some distance on each side of the point where the car swerved the road extends in a declining grade for those travelling in the direction in which defendant's car was being driven. The travelled portion is approximately twenty feet wide and easily accommodates two-way traffic. Stephens traced the car's tracks back from the tree to a point on the highway where they first began to show. They were skid marks, running practically down the middle of the highway, more on the left-hand side than on the right, then veering to the right, thence off the highway onto the shoulder, across a small ditch and through some brush to the tree. The marks extended approximately 100 feet on the highway and 40 to 50 feet from the highway to the tree.
Mary Savage testified by deposition in behalf of plaintiff: She had no memory of what happened on the day of the accident. She had driven several cars, including defendant's, on a few occasions before the accident, but not enough to know much about them. "I don't know the gears or anything like that." The owner was always present when she drove a car. She only operated the steering wheel, the owner by her side would operate the gears.
Portions of a deposition given by defendant on May 23, 1951, were read in evidence by his counsel. On direct examination, defendant testified: He was present by the side of Mary Savage as she drove his car on this occasion. He knew she could safely drive the car and considered her driving ability "satisfactory". Mary drove his car *474 about ten miles around town before they went to Atlee's Drive-In for plaintiff, during which time she was in control of it and operated it safely. She knew how to shift gears and apply brakes. He then testified: " * * * all I know is that in going down the road the car began to swerve violently and left the road and crossed the ditch and ran into a tree. * * * I couldn't figure out what caused it to do that way." No tire blew out. He did not attempt to grab the wheel.
A second deposition given by defendant on July 3, 1951, was also read in evidence by defendant's counsel. In that deposition, defendant testified: Mary properly drove the car, at all times shifted gears, applied the brakes and kept it on the right side of the highway. The lights on the car were perfect and Mary dimmed them as they met oncoming vehicles. He had direction and control of the car, but did not "set" the direction. On cross-examination, he admitted he had theretofore given a signed statement to a person who was investigating the accident and that he had read it before signing it and that it was true and correct. Upon objection of defendant's counsel, the following portion of the statement was not read to the jury: "I have a policy of insurance with Commercial Casualty Insurance Co. of Newark, New Jersey, and Milwaukee Mechanic's Insurance Co. of Milwaukee, Wisconsin, for $15,000 and $30,000 liability, and $50 deductible collision for my car, Policy number MF-1107." The remainder was admitted in evidence and read to the jury. Pertinent parts thereof are as follows:
"When we left Atlee's we weren't going anyplace in particular, we were just driving around. Mary [Savage] wanted to drive my car while we were in town, before we went out to Atlee's and I let her under the wheel. She said that she hadn't been driving very long and that she couldn't drive too good, but I thought that it would be all right for her to drive. * * * I knew there might be some risk involved in letting her drive, but I thought that if I sat in the seat beside her that I could help her control the car. She seemed to drive all right around town, and she made all the stop signs without any trouble. When she drove up to Atlee's she brought the car to a pretty good stop. I hadn't known Mary before that night that I had the date with her. I had never dated her before and didn't know whether she could drive or not. * * *
"As we drove south out of Springfield we drove toward Galloway. Mary drove about 30 or 35, and that's about how fast she was going at the time the accident happened. I wasn't going to let her get any faster than that. I watched the speedometer all the time and was sitting right there where I could grab the wheel in case anything happened. She drove east on a blacktop road toward Galloway, and just west of the city limits of Galloway the car just began to swerve and weave and throw me around. I don't know what happened to tell the truth. I car (sic) just seemed to get clear away from Mary. I grabbed for the wheel to try to help her straighten it out, but it was too late, and the car ran off the blacktop across a shallow ditch and hit a tree head-on."
Is the res ipsa loquitur doctrine applicable in this case? Defendant says it is not, first, because, he contends, a jury question is presented as to whether Mary Savage was negligent in failing to stop the automobile before it collided with the tree, and, second, plaintiff had as much information as to the cause of the accident as defendant. He argues that inasmuch as the car was only travelling at 30 to 35 miles per hour at the point where the tire marks began and thereafter travelled 100 feet before leaving the pavement and 40 to 50 feet before striking the tree, this court knows, and a jury would know, it could have been stopped by an application of the brakes before it hit the tree; ergo, specific negligence was proved. We do not think so. In Tabler v. Perry, 337 Mo. 154, 85 S.W.2d 471, 476, we quoted with approval from Huddy's Encyclopedia of Automobile Law: "The doctrine of res ipsa loquitur applies where an automobile runs wild, overturns, or runs off the roadway and strikes a person on the sidewalk, or collides with a tree, with a pole, or with a building." In this case the pavement was dry, the highway *475 straight and wide. Defendant was in control of the operation of the car. Had he operated it in the usual manner the accident would not have occurred. These facts, in and of themselves, warrant a finding of some negligence on the part of defendant. Harke v. Haase, 335 Mo. 1104, 75 S.W.2d 1001, 1003; Dodson v. Maddox, 359 Mo. 742, 223 S.W.2d 434, 438. But obviously they do not prove specific negligence in failing to apply the brakes. Indeed, it might be surmised that an untimely application thereof would (or did) accentuate the loss of control. Certainly, we cannot say that a swerving and skidding car can be stopped in a given distance or its course controlled by applying them. The inferable negligence in this case is the loss of or failure to control the movement of the car; the striking of the tree is only an incident of that negligence. It is also clear that defendant had means of information as to the cause of the occurrence superior to those of plaintiff. It was his automobile and he was supervising its operation. See Cruce v. Gulf, Mobile & Ohio R. Co., 358 Mo. 589, 216 S.W.2d 78, 79, 80. We hold that plaintiff made a submissible case under the resipsa loquitur doctrine.
In considering defendant's claim of error in overruling his application for continuance filed shortly before the trial which began on February 13, 1952, certain facts must be related. The original petition was filed August 22, 1950. It charged defendant with specific negligence in entrusting the operation of his car to an inexperienced driver and sought a recovery of $40,000 damages. Defendant entered military service on September 28, 1950, remained in the United States until August of 1951, and then went to Korea.
On March 31, 1951, plaintiff reduced the amount sought in her original petition to $15,000. By agreement of the parties, defendant's deposition was taken in Georgia, on May 23, 1951. On June 1, 1951, defendant's verified application for continuance, based upon his military service, was sustained, and the cause was set for trial on July 10, 1951. On June 8, 1951, (and while no application for continuance was pending) plaintiff filed an instrument designated a "counter-affidavit to defendant's motion for continuance and supporting affidavit". It was prepared in the form of an affidavit and was signed by Ransom A. Ellis, an attorney for plaintiff, but, for some reason not shown in the record, he did not swear to it. This instrument recited that defendant's liability for the amount plaintiff sought to recover, $15,000, was covered by a policy of insurance in the Commercial Casualty Insurance Company with $15,000-$30,000 limits and set forth the policy number; that the deposition given by defendant on May 23, 1951, revealed his entire knowledge of the occurrence out of which the suit arose; and that defendant could not be prejudiced by a trial during his absence.
On July 3, 1951, by agreement of the parties, defendant's second deposition was taken in Georgia, and was duly returned and filed on July 9, 1951. On July 10, 1951, the cause was continued on application of plaintiff. On September 8, 1951, plaintiff amended her petition to state a cause of action under the res ipsa loquitur doctrine. Thereafter, the cause was set for trial on February 13, 1952; and again, as stated, defendant filed application for continuance, which was overruled.
Defendant says the record does not show that he was insured as alleged by plaintiff; that the unverified statement of plaintiff's counsel filed when no application for continuance was pending proves nothing. But, even so, we do not think the matter material. Defendant does not question the fact that he was so insured. Furthermore, the fact that he was and is covered by insurance as alleged by plaintiff stands admitted in the unquestioned statement made by defendant and reaffirmed in his deposition taken and filed in this case long prior to the time the trial court overruled his last application for continuance.
Defendant says further that while the terms of the insurance policy are not before us, we should assume that it contained the standard form of "Assistance and Cooperation of the Insured" clause. In the two depositions, taken by agreement, defendant *476 had testified fully as to his version of the occurrence. In both he admitted that the car was operated and performed exactly as plaintiff testified and that he had no knowledge as to what caused it to perform as it did. It is true that there was a variance between his testimony with that of Mary Savage, but there is little or no substantial variance between the statement given by him and her testimony; and it must be borne in mind he reaffirmed the statement in his last deposition. It is inconceivable that he would have or could have consistently (and with good effect) given different testimony had he been present at the trial. Neither can it make the least difference that subsequent to the taking of defendant's depositions the petition was amended changing the basis of plaintiff's action from one of specific negligence to res ipsa loquitur; in no manner readily discernible could it have enlarged or changed his knowledge of the facts.
Section 201 of the Soldiers' and Sailors' Civil Relief Act of 1940, 54 Stat. 1181, 50 U.S.C.A.Appendix, § 521, requires continuance of a suit under the circumstances here present, "unless, in the opinion of the court, the ability of plaintiff to prosecute the action or the defendant to conduct his defense is not materially affected by reason of his military service."
In Gross v. Williams, 8 Cir., 1945, 149 F.2d 84, wherein the action of the trial court in overruling a motion for continuance in a case in which the facts were comparable to those in the instant case was under review, the Circuit Court of Appeals said, 149 F.2d loc. cit. 86:
"The mere fact of service in the armed forces of the United States does not entitle a party to a stay of proceedings against him as a matter of right. The trial court may and should deny the stay when it is apparent that the party absent in the military service will not be materially prejudiced by the trial of the case. Boone v. Lightner, 319 U.S. 561, 63 S.Ct. 1223, 87 L.Ed. 1587. Under the record in this case we can not say that the discretion of the trial court was erroneously exercised.
"Appellant complains of the court's statement concerning the indemnity insurance carried by the appellant at the time of the accident, saying there is nothing in the record to show that the appellant was protected by insurance, or if so, the amount of insurance and the terms of the policy. Appellant, however, does not deny that he was insured as the court stated. The record sufficiently indicates that appellees did reduce the amount of their claims from $62,000 to the amount of the insurance which appellant carried, and that the verdict of the jury in favor of appellees was less than the face amount of the policy. Moreover, at the time of the court's ruling it had before it the deposition of the appellant giving in detail his version of the accident out of which the litigation arose. This deposition, which covered every issue of fact raised on the pleadings and at the trial, contained as much to support, as it did to deny, the appellees' charge of negligence against the appellant. * * * The court may well have decided, from appellant's admissions, that the real issue at the trial would be the extent and character of the injuries sustained by appellees, a subject upon which the appellant knew nothing." See also Swiderski v. Moodenbaugh, D.C., 44 F.Supp. 687.
We hold the trial court did not err in refusing the continuance.
The difficult question in this case is whether the trial court erred in holding the verdict excessive and in ordering a new trial upon plaintiff's refusal to remit $6,000 from the judgment.
Plaintiff was sixteen years of age when injured. Her mother died when plaintiff was about five years old. She had worked ever since she was a little girl. She quit school before finishing the ninth grade to help her father in the home and kept house for him after her older sister married. Prior to the accident she had been a healthy girl, active in sports, liked to skate and ride her bicycle. For about three months before she was injured she had worked at Atlee's, her salary and tips averaging $35 per week.
Plaintiff was not rendered unconscious by the crash of the car into the tree. A lighted match revealed that her leg was broken just above the ankle joint. The bones protruded through the flesh. This *477 horrified her. She was taken by ambulance to St. John's Hospital and placed under the care of Dr. Horton. Following an X-ray examination, she was taken to an emergency operating room. Her memory was vague as to what occurred at the hospital until the second day after her admission, at which time she discovered the cast on her right leg and that she had many painful cuts and bruises. The cuts and bruises were minor, however, and healed in due course.
The first cast, from her hip to foot, was kept on for twenty-one days. It was replaced by a similar one, which remained on for three weeks. A third one, which extended only to the knee, remained on for about a month. After the removal of the last cast she used crutches for four or six weeks. Thereafter, she used them when her leg caused her excessive pain. She was under Dr. Horton's care for about four months and thereafter saw him only on a few occasions.
She returned to her work at Atlee's and worked there three days when her leg "just seemed to dissolve", did not have any strength in it. Her aunt and uncle took her home. She could not walk for several days and had to use crutches again. Her ankle became badly swollen and discolored. After that she worked at home, did baby-sitting and "things like that". In May of 1951, she went to Monett and worked in a cafe about a month. Her leg gave way while working there. Her sister brought her home. She did not again try to work for some time, but, in the fall of 1951, went to St. John's Hospital as a nurse's aid. She worked there about two months, and "just couldn't work any more". Since then she has been unable to work. When she stays completely off her leg it seems to be all right, but if she goes for a long walk or is on her feet for a few hours, it "gives out" and throbs with pain and she cannot sleep at night and is very nervous. She tried to resume skating, but could not skate. Finally, while visiting friends in Kansas City, she consulted Dr. Robert H. Fitzgerald and submitted to an operation.
Dr. Fitzgerald testified: His practice is limited to orthopedic surgery. He first saw plaintiff on January 11, 1952. She related to him her present symptoms. Examination revealed a one-half inch atrophy, that is, a smallness or wasting away of the muscles, of the thigh and calf of her right leg. The right foot showed pronation, which is a turning of the heel and foot toward the outside, much more marked on the right foot than on the left. She had a scar on her leg where the fractured bone came through above the ankle joint. Beneath the scar there was a roughening of the bone, possibly caused by a plate that had been put in there by the surgeon who set the fracture. There was tenderness over the area, some weakness in ability to pull her foot up and some limitation of motion.
X-rays show a misalignment of the ankle joint. The bones are not setting in their normal position. Actual measurement shows an eight-degree angulation at the joint. The angulation resulted from the position in which the fracture healed. Insofar as the work of the doctor who set the fracture is concerned it was an excellent result.
The immediate result of the condition found is that the weight distribution is concentrated at the narrow side of the joint and there will be more wear and tear on that side. The end result of that condition in such a joint is a traumatic type of arthritis, due to constant small traumata or bruising of the joint on that side. The misalignment found in plaintiff's lower leg is sufficient to cause the pain of which she complains. The misalignment is permanent and the anticipated arthritis will be permanent. The misalignment, of itself, will not change in the future but it will render plaintiff unable to do constant standing or walking. There is no hope the condition will ever get any better. It will eventually result in arthritic changes in the joint. There is no known remedy or method of curing the condition. Witness removed the plate from plaintiff's leg. It had caused irritation and sclerosis or scarring of the bone.
On cross-examination, Dr. Fitzgerald testified: The operation for removal of the plate consisted of laying the skin back and removing the screws that held the plate in *478 place. The sclerosis is not permanent. It is too early for development of the arthritic condition. All patients having such a misalignment do develop an arthritis in time. Plaintiff has complete use of the ankle joint to turn it inward and outward. The limitation of motion upward and downward is not excessive, probably ten degrees, and is not disabling but painful at times. The atrophy can be corrected by physical therapy, which consists particularly of weight lifting; walking will not do it. The therapy should be administered under medical supervision. The misalignment can never be corrected.
None of the testimony relating to plaintiff's injuries is contradicted. Defendant offered no evidence, lay or medical, on that subject. The record further reveals that prior to the trial, defendant had an examination made of plaintiff by Dr. Yancey, but did not produce him as a witness nor make any explanation of his failure to do so. It is to be inferred, therefore, that Dr. Yancey would not have testified that plaintiff's injuries were less serious and disabling than her medical testimony showed them to be.
Defendant contends the trial court had the opportunity to see, hear and observe the plaintiff and other witnesses and the right to take into consideration and weigh, as facts influencing the verdict, the many things that occur in the presence of the trial court that do not appear in the record on appeal; and that great deference should be given to the result of the calculations so made by him. But it must also be borne in mind that it is the jury's province, in the first instance, to assess the amount of damages. Cruce v. Gulf, Mobile & Ohio R. Co., 361 Mo. 1138, 238 S.W.2d 674, 681. The trial court is vested with a sound discretion in ordering a conditional remittitur, Polizzi v. Nedrow, Mo.Sup., 247 S.W.2d 809, 811, but he should not lightly or arbitrarily do so, Coghlan v. Trumbo, Mo.Sup., 179 S.W.2d 705.
In Steuernagel v. St. Louis Public Service Co., 361 Mo. 1066, 238 S.W.2d 426, 431, we held that in considering whether a verdict was excessive the trial court had the right to weigh the evidence and that if, upon examination of the record, the evidence, viewed in the light most favorable to the trial court's ruling, affords reasonable and substantial support of the order, then the order must be sustained. It is also true, of course, that if, upon examination of the record and indulging every presumption in favor of the ruling, the evidence does not afford reasonable and substantial support of the court's order, then it should not be sustained.
The uncontradicted evidence in this case, even when viewed in the light most favorable to the court's ruling, reveals that plaintiff's injuries were as serious and disabling as set forth in the preceding narration thereof. There is nothing inherently unbelievable in any of the testimony given on that subject. Therefore, the only question for review is whether the amount of the award, in and of itself, affords reasonable and substantial support of the order reducing it. In other words, is an award of $15,000 for the injuries sustained by plaintiff so excessive on its face as to establish its unreasonableness ?
As is usual, we find no case where the injuries and the damages awarded therefor are exactly parallel to those here presented. Defendant has cited the following cases: Steuernagel v. St. Louis Public Service Co., 361 Mo. 1066, 238 S.W.2d 426; McGarvey v. City of St. Louis, 358 Mo. 940, 218 S.W.2d 542; Heitz v. Voss Truck Lines, Inc., Mo.Sup., 175 S.W.2d 583; O'Brien v. Vandalia Bus Lines, Inc., 351 Mo. 500, 173 S.W.2d 76; Mrazek v. Terminal R. Ass'n, 341 Mo. 1054, 111 S.W.2d 26. We find none of them at all convincing that an award of $15,000 for injuries as extensive, painful and permanently disabling as shown in this case is excessive.
Plaintiff has cited the case of Young v. City of Farmington, Mo.Sup., 196 S.W.2d 124, 128, decided in 1946. The age of the plaintiff therein, his earning capacity, his loss of wages (and medical expense, which plaintiff herein did not prove) are different from those of plaintiff herein, but these variations may be said to fairly offset each other, and the injuries are quite similar in *479 extent, duration and disabling effectiveness. In that case we held not excessive a $12,000 judgment rendered after the trial court had ordered remittitur of $3,000 from a verdict of $15,000. When we contrast the purchasing power of today's dollar with that of 1946, it would seem that a judgment of $12,000 in 1946 would fairly approximate in value a judgment of $15,000 today. See also: Zumwalt v. Chicago & A. R. Co., Mo. Sup., 266 S.W. 717, 726, decided in 1924, wherein we approved a verdict of $18,000 for somewhat similar, perhaps more disabling, injuries; and McKnight v. St. Louis Public Service Co., Mo.Sup., 235 S. W.2d 560, decided in 1951, wherein we approved a judgment of $15,000 after remittitur of $3,750 from a verdict of $18,750 for somewhat comparable injuries.
We hold that the record in this case does not afford reasonable and substantial support of the trial court's order setting aside the verdict and judgment rendered herein and in ordering a new trial. The order granting a new trial should be set aside and the judgment originally entered thereon should be reinstated. It is so ordered.
All concur.