DWIGHT SANDERS, (Plaintiff) Respondent, v. ILLINOIS CENTRAL RAILROAD COMPANY, a Corporation, (Defendant) Appellant, No. 43605 —270 S. W. (2d) 731.

Court en Banc, September 13, 1954.

*Watts & Gentry* for appellant; *J. H. Wright* and *H. J. Deany* of counsel.

*Max C. Nelson* and *John C. Casey* for respondent; *Roberts P. Elam* of counsel.

1012

BENNICK, Special Judge.—This is an action for damages for personal injuries sustained by plaintiff, Dwight Sanders, on July 18, 1951, when he was caused to be thrown from the top of a refrigerator car which was a part of a string of freight cars being moved at the time by a switching crew of defendant, Illinois Central Railroad Company, in the latter's yard at Centralia, Illinois.

Upon a trial to a jury in the Circuit Court of the City of St. Louis, a verdict of nine jurors was returned in favor of plaintiff, and against defendant, for the sum of $88,000.

In due time defendant filed its motion for judgment in accordance with its previous motion for a directed verdict, or, in the alternative, for a new trial upon the ground, among other things, that the verdict was excessive.

Upon consideration of the matter the court entered an order requiring a remittitur of $18,000 as a condition to the overruling of the motion for a new trial. Plaintiff made the suggested remittitur, whereupon the court rendered a new judgment ▆▆▆ for plaintiff, and against defendant, for the sum of $70,000, and at the same time overruled defendant's motion for a new trial. Defendant thereupon gave notice of appeal, and by proper successive steps has caused the case to be transferred to this court for our review.

Plaintiff was an employee of the Southern Illinois Ice Company, which maintains a large icehouse in defendant's yard at Centralia from which it supplies ice for icing refrigerator cars as they pass through Centralia in fruit and vegetable trains to whatever their respective destinations may be.

Standing immediately between two switch tracks, the one for northbound and the other for southbound traffic, is a platform 950 feet in length, which permits 17 cars to be spotted alongside of it and iced simultaneously. The platform is about 14½ feet in height, or roughly even with the top of a refrigerator car. From the icehouse there is an elevated runway extending out to the platform

over which large blocks of ice are brought out to the platform by means of an endless chain mechanism, and then are moved along the platform to points adjacent to the bunkers at the respective ends of the refrigerator cars into which they are to be placed. Two men work together at icing a car, one standing out on top of the car at the bunker he is to fill, while the other remains on the platform and shoves the blocks of ice across a skidway to the man on the car, who breaks the blocks up into proper sizes with a large metal pick and forces them down into the bunker. Each block of ice weighs about 100 pounds when it is put into the bunker, and from 18 to 20 blocks are required for fully servicing a car.

On the day in question a train of 60 refrigerator cars loaded with perishable merchandise had entered the yard from the south and had been placed by the road crew upon the northbound track running alongside the icing platform. Defendant's icing clerk thereupon informed the ice company by telephone of the service to be required, which, in this case, was limited to supplying ice to but a single car which was attached to the extreme rear end of the train behind the caboose at a point near the south end of the icing platform.

After the cars had been placed on the track running alongside the icing platform, the road engine was uncoupled and moved away by the regular crew, and any further movement of the cars or any part of them delegated to a switching crew with the aid of a switch engine.

Plaintiff was ordered out to the job by one Jolliff, the ice company's engineer, who accompanied him on the job and as a matter of fact went out upon the top of the car with him. However, before going over upon the car plaintiff and Jolliff were first careful to ascertain that the engine had been disconnected, a precautionary measure they were required to observe under the rules and regulations of the company.

In filling his bunker plaintiff faced to the south, which meant that his back was turned to the head of the string of cars of which the one upon which he was employed was the last. He had completed his task of filling the bunker, and was leaning over in the process of fastening the lid or cover down upon it, when the car was suddenly moved forward, causing him to be precipitated to the ground below, where he sustained the very serious injuries for which he seeks to be compensated in this proceeding.

It was the usual practice for the icing clerk to give notice in advance that a car was coming in to be iced so that the ice company's employees could have the blocks of ice out on the platform and be ready to fill the bunkers as soon as the car arrived. However on this occasion, as has already appeared, there was no notice given until after the car had been spotted, which meant that the job was thereby prolonged by the additional time it took to bring plaintiff

and his co-workers out to the car and to convey the ice to the proper location. Approximately 4 minutes were required for the actual work of filling the bunkers, and from 5 to 10 minutes to bring the men and ice out to the platform, with an added 2 or 3 minutes in this instance due to difficulty ▇▇▇ which was encountered by reason of having blocks of ice become caught in the conveyor. Meanwhile a switching crew had detached some 25 cars from the train and distributed them to various other switch tracks in the yard, leaving only 35 cars on the track running alongside the icing platform. Plaintiff was aware before he started in on the job that the 25 cars had been uncoupled and moved away, which, as a matter of fact, was something customarily done in such cases so as to avoid having the string of cars extend so far up the track as to block a road crossing some 750 feet north of the icing platform.

After the 25 cars had been uncoupled and moved to various other switch tracks in the yard, the switching crew returned to move out the remaining 35 cars which had been left standing alongside the icing platform. The switch engine was headed south with a single car in front of it, and coupled into the string of cars with such little force that the jar of the coupling could not have extended down to the car upon which plaintiff was working so as to have put him on notice of what was taking place. Instead it was the sudden movement forward when the slack was taken up that caused him to be thrown off the car to the ground below as the train started up at a speed of 3 or 4 miles an hour.

There was an abundance of evidence that cars which had been spotted for icing were not to be moved until the switching crew was informed that the icing job had been completed; and it was wholly undisputed that on this occasion there was no notice given of any kind or character that the string of cars was about to be moved. Prior to the coupling some members of the switching crew observed 2 or 3 men on the icing platform, but none of them saw plaintiff and Jolliff on top of the car, which was for the reason that they did not go down close enough to the car to be in a position to ascertain with certainty if there was any one still upon it. It was also shown that defendant had rules which provided, in effect, that cars upon or about which men might be working were not to be moved without first finding out whether men were so engaged, and without giving them notice before the engine was coupled to the cars.

In view of the evidence which was so largely in accord, there is no pretense by defendant that plaintiff did not have a submissible case of actionable negligence on its part in the respect pleaded and submitted; that is, in failing and omitting to give plaintiff a timely and adequate warning of the starting and movement of the train including the car upon which plaintiff was employed. Instead, so far as any question of negligence is concerned, defendant rests its

whole complaint upon the single proposition that the court erred in giving plaintiff's principal instruction No. 1 for the alleged reason that such instruction, while purporting to cover the whole case and direct a verdict in plaintiff's favor, ignored the issue of contributory negligence which had been pleaded in the answer, and which, in defendant's view of the case, had been supported by substantial evidence.

While neither party makes any suggestion that the law of Illinois has either been invoked or must be applied, the question of the submission of the defense of contributory negligence, being a matter of procedure, would in any event be governed by the law of Missouri. Menard v. Goltra, 328 Mo. 368, 40 S. W. 2d 1053; Williams v. East St. Louis Ry. Co., Mo. App., 100 S. W. 2d 51. Our own rule is, as defendant points out, that when the defendant pleads contributory negligence, and there is evidence to support it, an instruction for the plaintiff which purports to cover the whole case and direct a verdict is erroneous if it omits a requirement for a finding upon the issue of contributory negligence, unless the defendant cures the error by submitting the issue in an instruction of its own. Heigold v. United Rys. Co., 308 Mo. 142, 271 S. W. 773; Smith v. Gately Stores, Mo. App., 24 S. W. 2d 200; Kaiser v. Jaccard, Mo. App., 52 S. W. 2d 18.

In this case, as has already been pointed out, defendant did plead contributory negligence but asked no instruction ▮ upon it, as a consequence of which plaintiff's instruction No. 1 was necessarily erroneous for ignoring the issue of contributory negligence if there was substantial evidence to have warranted its submission. This is therefore the whole question upon which the propriety of the instruction depends—whether there were facts and circumstances in evidence from which the jury could have fairly and reasonably found that plaintiff was himself guilty of negligence directly contributing to his injury in any one or more of the respects charged against him.

In its answer defendant set up that plaintiff was thoroughly familiar with all the dangers incident to working on top of the refrigerator car and knew or should have known that defendant was switching cars in the yard and on the track on which the car was standing and that the car was likely to be moved and cause him to fall unless he exercised due care for his own protection, but that even though the bell on the engine was ringing and the whistle blown, and even though the noise of the engine and cars could be plainly heard, he negligently failed to listen for such noises and to guard against the danger of being thrown from the car.

So far as this particular charge was concerned, the members of defendant's switching crew admitted that there was no signal given by bell or whistle except the signal for the public crossing 750

feet to the north, nor was there any evidence that the noise of an engine in the busy switching yard could have been detected and singled out by plaintiff in such a way as to have constituted a warning to him, even if such a signal had been given and he had heard it along with all the other similar noises coming from adjacent tracks.

Defendant argues, however, that in addition to the pleaded charge of contributory negligence, there was evidence which came in without objection from which the jury could properly have found that plaintiff was guilty of negligence in not paying attention to his surroundings and to the danger of the movement of the car on which he was employed.

Plaintiff had of course testified that he paid no attention to bells and whistles or the like after he got on top of a car for the reason that it was the invariable custom for the car never to be moved until defendant's employees had first made sure that the icing job had been completed and that any men who had been engaged at such a job were off of the car and back on the platform in safety. Moreover this custom, according to plaintiff's testimony, took no account whatever of the time element, but was to be strictly followed regardless of how long a period of time might have elapsed before the switch engine returned to pick up the remainder of the cars after distributing an initial portion of them throughout the yard.

The evidence upon which defendant now relies was contained in the deposition of one McMenamy, the engineer who was operating the switch engine that figured in the accident. McMenamy's deposition had been taken by plaintiff's counsel but was read in evidence as a part of defendant's case.

McMenamy had testified that when, as in this instance, a part of a string of cars was cut out and taken away, there was no practice or custom of giving any sort of warning before coupling into the remaining string of cars for their removal. This upon the theory that after 20 to 25 minutes had been consumed in distributing the first string of cars throughout the yard, it would normally be assumed that the 4-minute job of icing a car would have been completed and the men out of danger by the time the engine returned for the second string of cars.

Defendant now argues that if the custom actually was as McMenamy related, then plaintiff, in not watching out for his own protection whenever the engine might return, might well be regarded as having been guilty of negligence contributing to his injury, and that the ultimate question was therefore one for the jury to resolve as between McMenamy's version of the facts and that to which plaintiff himself had testified.

There are at least two things wrong with this suggestion. In the first place, plaintiff had not yet arrived on the job when the

1018

first string of cars was taken away, so that McMenamy, not knowing when he came out on the platform, could not have assumed that he had been there long enough to have completed the job, even if the custom had been as McMenamy said it was. It will be recalled that on this occasion defendant's icing clerk, instead of giving the usual notice in advance that a car was coming in to be iced, had delayed his notice until after the car had been spotted for a while. In the second place, even if such a custom had existed as McMenamy claimed, there was no proof whatever that plaintiff was aware of it, absent which there could be no other conclusion than that plaintiff had had the right to rely upon defendant's observance of proper precautions to avoid injuring him.

There were no facts or circumstances in the case to have supported the submission of the question of contributory negligence, and plaintiff's instruction No. 1 was consequently not erroneous by reason of its failure to have included a finding upon such issue.

There is greater difficulty presented by defendant's second point—that the judgment, even after remittitur in the lower court, is still grossly excessive so as to require further substantial reduction. It will be recalled that the lower court, as a condition to overruling the motion for a new trial, required a remittitur of $18,000, thus reducing the damages from $88,000, the amount of the verdict, to $70,000, the amount of the judgment from which the appeal is taken. Defendant argues that the damages should be further cut by this court to a sum not exceeding $25,000.

This court has long adhered to the generally prevailing rule that in a case such as this, if there is no error in the record except that the judgment is for a greater amount of damages than the evidence will support, the appellate court, instead of unconditionally requiring a new trial, will determine the amount of the excess and then give the plaintiff the option of remitting the excess and having an affirmance of the judgment for the remainder. The purpose of the practice is to avoid the expense and delay of a new trial; and the court grants the plaintiff such election without regard to the consent of the defendant, who can not be harmed by whichever choice the plaintiff makes. The practice is of course only pursued when there is nothing in the record to indicate that the excessive verdict was due to anything other than mere mistake or misunderstanding on the part of the jury, and not when it was attributable to passion and prejudice of the jury, which necessarily vitiates the verdict in its entirety. However in affirming a judgment upon the condition of remittitur, it is to be remembered that the appellate court is not substituting its own judgment for that of the jury in fixing the amount of the damages, but is only determining the maximum amount which the evidence would support, and at the same time saying that if the jury had stopped at such amount, the verdict in

that event would have been allowed to stand. Counts v. Thompson, 359 Mo. 485, 222 S. W. 2d 487.

In applying the doctrine of remittitur the trial court's approach to the matter is materially different from that of the appellate court. The trial court has the right to weigh the evidence; and in performing its function of determining the question of the excessiveness of the verdict it may and should consider any conflicting evidence upon the nature and extent of the plaintiff's injuries, and place its own evaluation upon all the evidence from both sides of the case in the light of its own peculiar opportunity to see and observe, not only the plaintiff himself, but also the various witnesses who testified. Steuernagel v. St. Louis Public Service Co., 361 Mo. 1066, 238 S. W. 2d 426. It should of course keep in mind—as indeed the appellate court should likewise do—that the amount of damages to be allowed in any given case is primarily a matter for the jury (Cruce v. Gulf, Mobile & Ohio R. Co., 361 Mo. 1138, 238 S. W. 2d 674), and yet it has the power to impose a check and restraint upon the jury where it appears that because of misunderstanding or mistake the jury's verdict has been too large. It should obviously not undertake to interfere with the verdict upon light or arbitrary grounds (Lindsey v. Williams, Mo. Sup., 260 S. W. 2d 472), but in a situation which affords some sound basis for disturbing the jury's finding it has the final say (subject only to appellate review) as to what will constitute fair and just compensation for whatever injuries the plaintiff has sustained.

In contrast to the position occupied by the trial court, the appellate court does not weigh the evidence, but instead determines the question of excessiveness as purely one of law. Steuernagel v. St. Louis Public Service Co., supra. Where the trial court has let the verdict stand, it is the duty of the appellate court to consider the evidence which tends most strongly to support the verdict, and to disregard conflicting evidence. Henderson v. Dolas, Mo. Sup., 217 S. W. 2d 554; Hoffman v. St. Louis Public Service Co., Mo. Sup., 255 S. W. 2d 736; Wright v. Spieldoch, 354 Mo. 1076, 193 S. W. 2d 42. But where, as in this case, the trial court has ruled the motion for a new trial upon the amount of the verdict and thus upon the weight of the evidence, the appellate court, whether on the plaintiff's appeal after refusal to remit, or on the defendant's appeal after the entry of a remittitur which the defendant regards as inadequate, will not be concerned with the amount of the verdict, but will rather look to see whether the evidence, viewed in its most favorable light for upholding the action of the trial court, does in fact afford reasonable and substantial support for the trial court's order or remittitur. If it does, then there has been no abuse of discretion and the trial court's action must be sustained, but if not, the action in that event will be reversed. Wilhelm v. Haemmerle, Mo. Sup.,

262 S. W. 2d 609; Daniels v. Brown, Mo. Sup., 266 S. W. 2d 680; Steuernagel v. St. Louis Public Service Co., supra. And where the appellate court does find that there has been an abuse of the trial court's discretion, it may, as the case requires, either overrule the remittitur and direct the restoration of the judgment entered upon the verdict (Lindsey v. Williams, supra), or it may, as it frequently does, require a further remittitur as a condition to the affirmance of the judgment for the remainder. Votrain v. Illinois Terminal R. Co., Mo. Sup., 268 S. W. 2d 838.

As the matter is presented on this appeal, the precise question for our decision is whether the trial court exercised a sound discretion in limiting the remittitur to $18,000. Plaintiff has not appealed and therefore makes no pretense that he should recover the full amount of the verdict, but instead merely insists that his judgment for $70,000 should be affirmed. On the other hand defendant contends, as we have already pointed out, that the judgment is still grossly excessive, and should be further reduced to not more than $25,000.

Plaintiff was 36 years of age at the time of the accident, with a life expectancy of 32.6 years. So far as formal education is concerned, he had only completed the seventh grade, and had then worked on a farm until after he was married. He had driven a truck for a while, and had been employed at a local air refinery for 8 years except for an interval of 2 years while he was in military service. He had also worked for a dairy, and then for the Centralia water department, where he was paid a wage of $59 for a 5-day week. His employment by the ice company was extra work which, for the last year or so before his injury, had averaged 2 days a week. For his work with the ice company he was paid $1.10 an hour, or $8.80 for an 8-hour day.

When plaintiff was precipitated from the top of the refrigerator car, he struck on his feet and then fell over upon the ground from which he was unable to arise by his own efforts. He immediately experienced severe pain, and called out for help in his predicament. In response to his call two of the ice company's employees came out to his assistance and carried him over to the office, from whence he was then taken in an ambulance to St. Mary's Hospital in Centralia and placed in the care of a Dr. A. P. Heller.

X-ray pictures which were taken at the hospital disclosed a comminuted fracture ▮▮▮ of the os calcis or heel bone of each foot, with a fracture line extending in each instance into the subastragalar or ankle joint, and with several other fracture lines in other portions of the bone extending upward toward this principal line. The significance of a fracture line extending into a joint is that it denotes some degree of injury to the joint itself, some interruption in the articulating surface or smoothness of the joint, which in turn indicates

the possibility of future trouble with the joint, or can be a predisposing factor in the development of arthritis in it.

The operative treatment pursued by Dr. Heller was what is known as the Palmer operation (so called after an English surgeon who has used it quite successfully), by which the bone is pulverized by blows from a mallet and then remolded into normal shape and alignment, following which the heel is encased in a plaster cast and thus held in position until in effect a new heel is formed. This type of treatment, while not necessarily accepted in all orthopedic circles, was devised by reason of the fact that the inner aspect of the os calcis is soft bone, which lends itself to this mode of procedure.

While plaintiff remained in the hospital for only 12 days, his feet were kept in casts for 3 months when the casts were removed by a Dr. Gillette, one of defendant's regular physicians at Centralia. Dr. Heller had meanwhile died only a short period of time after performing the operation.

An insurance company against which plaintiff had a claim growing out of the accident referred him to Dr. E. C. Funsch in St. Louis, who limits his practice to traumatic surgery. Dr. Funsch first saw plaintiff on January 30, 1952, and last saw him in April of that year. He prescribed the use of metal plates which fit into the shoes and by supporting the bottom of the feet permit plaintiff to throw more weight on the balls of his feet and thus in a measure relieve the pain in walking. Plaintiff himself laid great store by his metal plates, and testified that he could not walk without them.

After plaintiff employed counsel he was sent for examination to Dr. Robert Mueller, an orthopedic specialist in St. Louis, who in turn arranged for X-ray pictures to be made by Dr. Harry I. Berland, a radiologist. Dr. Mueller first saw plaintiff on October 15, 1951, and last saw him on October 11, 1952, a day or so before the beginning of the trial. Additional examinations were made by Dr. John T. Vandover on October 1, 1952, and by Dr. Carl Fellhauer on October 10, 1952.

Suffice it to say that the doctors were all in substantial accord in regard to plaintiff's condition. The fractures themselves had healed through the natural process of throwing out callus. However the extension of the fractures into both ankle joints had caused the development of traumatic arthritis in both joints, the pain of which had a tendency to limit or restrict plaintiff's use of the joints. There had been a flattening and widening of the bone with the result that the angles of articulation had been reduced from a normal of 35 or 40 degrees to 14 degrees in the right foot and 22 degrees in the left. The significance of this was that it affected the arches and tended to move the weight bearing line of the body back, thereby contributing to the mechanical instability of walking. There had been an impairment of motion in both ankles, but especially so in the right ankle.

There was a definite fullness indicative of bone injury under the malleoli of both feet.

Plaintiff walks with a very noticeable limp or cautious step on each foot, and has used a cane since early in 1952. While he is able to walk a few steps without his cane, as, for instance, from one point to another inside a room, the evidence shows that for all practical purposes he is completely dependent upon his cane. He himself testified that with the aid of his metal supports and cane he can walk a maximum distance of 10 or 12 blocks, but then must find means to sit down and take the weight off his feet. By reason of the deformity of his heels, and in order to protect himself from the pain attributable to the arthritic condition of his ankles, he walks by swinging his legs from the hips, with knees and ankles stiff. The consequence of this is to put undue tension on the muscles of his back, and thereby produce the pain in his back of which he complains. There was an abundance of evidence that his condition is permanent.

While an appellate court will always have due regard for the action of the trial court in those instances where, by ordering a remittitur, the trial court has affirmatively expressed its view of what the amount of the damages should be, it will nevertheless not hesitate to require a further reduction whenever its own consideration of the record impels the conclusion that the trial court has left the award at a higher figure than the evidence will reasonably sustain. In other words, if the judgment appealed from, even though entered after remittitur, is still so far beyond the bounds of reason as to shock the judicial conscience (Peterson v. Kansas City Public Service Co., Mo. Sup., 259 S. W. 2d 789), the appellate court will have no recourse but to condition its affirmance of the judgment upon a cut to the maximum amount which, as a matter of law, the evidence will support.

Although there is no question that plaintiff has been grievously injured, he is not to be regarded as totally incapacitated. On the contrary, his own doctors admitted that even though he could not do any work that would require him to be on his feet, he could hold any job for which his training and experience would qualify him that could be performed sitting down. He has been driving his automobile around Centralia since the casts were removed from his feet in the early part of 1952, and he drove it the 69 miles from Centralia to St. Louis to attend the trial, and expected to drive home in it when the trial was over.

While it could hardly be expected that any two cases would be so precisely alike in point of injuries that one would be decisive of the other, there are cases presenting somewhat comparable degrees of disability in which this court has had occasion to determine affirmatively how large an award could be permitted to stand. Two of such cases are Joice v. Missouri-Kansas-Texas R. Co., 354 Mo. 439, 189 S. W. 2d 568, and Tatum v. Gulf, M. & O. R. Co., 359 Mo. 709, 223

S. W. 2d 418. In the first case the maximum damages allowable were fixed at $50,000; in the second case at $42,500.

There can obviously be no fixed scale or mathematical formula which would satisfy all the requirements for determining whether and how much a judgment is excessive. Nevertheless there are numerous important considerations relating to the question with which the bench and bar are thoroughly familiar. Chief among these is necessarily the nature and extent of the plaintiff's injuries, the pain and suffering attendant upon them, and the resulting disability as it has affected his earning capacity past and future. This in turn involves due regard for prevailing economic conditions and the current inflationary trend. Then too simple justice would itself dictate that in every case we have in mind the size of awards permitted to stand in comparable cases under comparable circumstances. To go into greater detail would serve no useful purpose. Suffice it to say that in the light of all the usual tests it is the considered opinion of the court that the present judgment of $70,000 is still excessive by the sum of $25,000.

If plaintiff will, within 15 days, enter a remittitur in this court in the sum of $25,000, the judgment will be affirmed for $45,000 as of the date of its entry in the lower court; otherwise the judgment will be reversed and the cause remanded for a new trial.

It is so ordered.

*Hyde, Hollingsworth, Dalton, Leedy, JJ., Conkling, C. J., and Cave,* Special Judge, all concur.