**Delbert P. COMBS, Appellant,**

v.

**Joseph Lee COMBS, Respondent.**

**No. 45556.**

Supreme Court of Missouri.

Division No. 1.

Nov. 12, 1956.

Sherman Landau, St. Louis, for appellant.

Moser, Marsalek, Carpenter, Cleary & Carter, Lee M. Carter, St. Louis, Paul E. Fitzsimmons, St. Louis, of counsel, for respondent.

## 80

HOLLINGSWORTH, Judge.

Plaintiff sued to recover the sum of $35,000 for personal injuries sustained when an automobile operated by defendant, in which plaintiff was a passenger, crashed into a concrete bridge abutment on Highway No. 21 near Belleview, Missouri. The jury returned a verdict and judgment was entered in his favor for the sum of $15,-000. Defendant's motion for new trial was overruled on condition plaintiff remit the sum of $5,000, which plaintiff refused to do, whereupon the motion was sustained and a new trial was granted defendant on the ground of excessiveness of the verdict. Plaintiff appealed.

The propriety of granting a new trial on the ground of excessiveness of the verdict is the sole question presented and a brief statement of the manner in which the collision occurred will suffice. As defendant drove the automobile northward on the east traffic lane of the highway, plaintiff was beside him in the front seat. Defendant went to sleep. The automobile veered across the highway and crashed into the west abutment, which was about 4½ feet high and 16 to 18 inches thick, knocked the abutment into the stream below and the automobile was demolished. Further details of the occurrence are set forth in the companion case of Combs v. Combs, Mo., 284 S.W.2d 423.

The law by which the question presented is to be determined is well settled. It is the jury's province, in the first instance, to assess the amount of damages to which plaintiff is entitled, Cruce v. Gulf, M. & O. R. Co., 361 Mo. 1138, 238 S.W.2d 674, 681, and the trial court should not lightly set such an award aside, Lindsey v. Williams, Mo., 260 S.W.2d 472, 478. However, the trial court is vested with a wide discretion in ordering a new trial on the ground of either excessiveness or inadequacy of the verdict and its action will not be disturbed if it is reasonably supported by substantial evidence. See the

collected authorities and decision of this court, en banc, in the case of Steuernagel v. St. Louis Public Service Co., 361 Mo. 1066, 238 S.W.2d 426, 431, [9–13]. See also Nix v. Gulf, M. & O. R. Co., 362 Mo. 187, 240 S.W.2d 709, 712; Parks v. Thompson, 363 Mo. 791, 253 S.W.2d 796, 798; Lindsey v. Williams, supra; Wilhelm v. Haemmerle, Mo., 262 S.W.2d 609, 612; Sanders v. Illinois Central Railroad Co., 364 Mo. 1010, 270 S.W.2d 731, 737.

The ruling in those cases is that when the trial court grants a new trial on the ground of excessiveness, its order is equivalent to the granting of a new trial on the ground that the verdict is against the weight of the evidence. In the exercise of that important function, it is the right and duty of the trial judge to consider and weigh the evidence in the light of his opportunity to hear and observe the plaintiff and all other witnesses who appear before him and to give to their testimony such weight and value as he deems it entitled. If the trial court determines that the injuries are not so serious or disabling as to warrant the award of the jury and orders a remittitur, as he did in the instant case, it becomes the duty of this court on appeal, not to weigh the evidence, but to determine only whether there is evidence that substantially and reasonably supports the view and finding of the trial court. If the evidence, viewed in the light most favorable to the court's ruling, reasonably supports the order, it is our duty to sustain it. If the evidence viewed in that light does not reasonably support the order, then it is our duty to set it aside and remand the cause with such directions as are appropriate.

Plaintiff, a graduate engineer, 32 years of age when injured on June 28, 1953, was in the employ of Pittsburgh Plate Glass Company. He was taken to St. Mary's Hospital in Ironton, where he remained from June 28, 1953, until July 2, 1953, on which latter date he was transferred to the Veterans Administration Hospital at Jef-

ferson ·Barracks, Missouri, where he remained until July 14, 1953.

His record at St. Mary's Hospital showed: He was conscious on admission but at times showed slight confusion. There were lacerations of the forehead, left side of the head, left cheek, chin and right leg, which were repaired under anesthesia. His blood pressure was normal. The diagnosis was "cerebral concussion" and his condition "improved" during his stay at St. Mary's. The record at Veterans Hospital recited, as a part of his history, that he had suffered a mental illness about one and one half years prior to the accident, during which time he had been hospitalized for one month, received shock therapy and had been discharged in March, 1952, and that he said he had been free from any symptoms of such illness since his discharge. It also showed: Upon arrival, he complained of severe headaches and diplopia (double vision) when he looked downward following the collision. There were lacerations and contusions on his face, head, near the sternum (breastbone) and over his legs. There was no evidence of skull fracture. The vertebral bodies were of normal alignment and the intervertebral spaces of normal width. He had ecchymosis (extra-vasated blood beneath the skin) in the area of his right eye and a hemorrhage into the white of that eye. His vision was normal, except for occasional diplopia. The impression of the physician who examined his eyes was that there was some paresis (paralysis) of the muscles of the left eye and an "error of refraction, type undetermined". The doctor further noted on the record: "We believe some of this will return spontaneously with the patient's general health improvement * * *." On July 4th, two days after admission, plaintiff's condition was "uneventful" except for episodes of mild diplopia. The record of July 11th reads: "Minimal episodes of diplopia. No gross neurological pathology present as far as reflexes are concerned. Probably

will be discharged on July 13, '53, if he continues to show improvement." On July 14th, he was discharged to return in three months for re-evaluation. The post-hospitalization record, dated October 19, 1953, showed "head injury, contusions syndrome" (a group of symptoms, characterizing a disease or injury). The record of his progress stated: "Patient has done well, working regularly. Only complaint is that he tires easily and gets nervous at times. Don't believe these are significant. Need not return."

Plaintiff testified: His salary at Pittsburgh Plate ·Glass Company was about $455 per month, which included one half day of work on Saturdays at overtime rates. In August, 1953, the doctor for the Pittsburgh Plate Glass Company examined him and permitted him to resume his work. (His salary had been paid without interruption.) In December, 1953, plaintiff gave up his employment because he was unable to work six days per week. He was offered employment by Emerson Electric Company at $535 per month for a six-day week and by Douglas Aircraft at $545 per month for a six-day week, but could not accept due to his condition. Two months after leaving Pittsburgh Glass he went to work for Airtherm on a five-day week basis at a salary of $400 per month. He continued to suffer from headaches, was nervous and continued concentration bothered his head and he was weak. He left Airtherm in June, 1954, because he wanted to get away from that work and get something lighter, and went into the business of building homes for sale, where he could work when he felt like it, and he has been able to do that. He has been under the care of Doctors Agress, Moore and Ford.

At the trial, he said that he suffered from headaches, dizziness, nervousness and loss of coordination, restlessness at night, weakness and inability to concentrate over a long period of time; that the

condition of double vision returns at times; that his back has been sore ever since the accident, but that he did not injure it in any way in the accident and thinks "the nervousness or something" makes his back more painful. He wears an elastic brace in the daytime and sleeps on a hard bed. He had trouble with his back in 1946, for which he received treatment at the infirmary at the University of Arkansas and later went to the Veterans Hospital for further treatment. It was quite severe for a year. After that he had a few spells with it, but not for three years before the automobile accident. The general condition of his health was good prior to the collision.

Plaintiff admitted that after entering into the housebuilding business he has built four houses and has five under construction; that in conducting that enterprise he has seven or eight subcontractors working under him, with whom he makes all contracts and whose work he supervises; that he attends to the details of financing the houses and all of the business details incident thereto; and that when he has the time and "feels like it" does some of the carpentry work.

Plaintiff's testimony further tended to show medical and hospital bills amounting to $746. He computed his wage loss to be $910 for the interim between cessation of his six day per week employment at Pittsburgh Plate Glass Company and the beginning of his five day per week employment at Airtherm; wage loss of $200 due to the reduced wages received at Airtherm for four months; a wage loss of $1365 during the three month interim between his leaving his employment at Airtherm and getting his housebuilding enterprise under way; and, finally, a claim of loss of $1,460 during the first year of his entry into the building business, reckoned upon the alleged difference between what he would have received in gross wages ($5,460) had he remained at his employment with Pittsburgh Plate Glass Company and profits in the sum of $6,344 realized from the sale of three houses during that year, less an estimated overhead expense of $2,344.

Dr. Harry Agress, specializing in internal medicine, testified in behalf of plaintiff: Since April 19, 1954, he has seen plaintiff between twenty and thirty times. He always appeared apprehensive. He was quiet spoken, but his hands were shaky, his voice tremulous and his hands sweaty. This varied from time to time at different visits to the office. He has a V-shaped scar over the left side of his head just above the eyebrow that measured two-and-a-half inches in one direction and three in another. He has a one inch long scar on the left cheek. There was tenderness on the right side of his head at the area where he said he had the big bump. His left pupil was a little larger than the right on the initial examination, and these pupils varied from time to time. There were times when they were equal. There seemed to be some variation of what was going on in this patient from time to time. Sometimes his pulse would be rapid and sometimes normal. It was a sort of thing you would expect in an individual that is inclined to be nervous. Most of the time his reflexes were normal, but at times they were abnormal, and the condition of his back varied from time to time. Dr. Agress' final diagnosis was that plaintiff has post-concussion syndrome; that, as a result of the accident, he developed symptoms referable to his back; and that the symptoms relating to his head injury and the symptoms relating to his back and the scars are permanent.

Dr. Walter L. Moore, a specialist in mental diseases, also testified in behalf of plaintiff: At the request of Dr. Agress he examined plaintiff on December 27, 1954. There was an enlargement of the pupil of the left eye, it was 25 per cent larger than the right. But the fields of his vision were normal. Except for the condition of the pupils, there was no evidence of organic disease of the nervous system.

Dr. Moore's opinion was that the patient had "moderate severe" post-concussional syndrome, which resulted from the accident. He re-examined plaintiff on September 27, 1955, two days before trial. His pupils were of equal size. He still has pain in the back of the head and across the lower back and nervous spells when under tension. He tires easily and still complains of not coordinating like he should. When he gets tired, he tends to stumble. Most patients who have these subjective symptoms after 18 to 24 months continue to suffer from them indefinitely and, the doctor concluded, that would apply in this particular case.

Defendant's evidence consisted of the testimony of two physicians. Dr. Robert Dean Woolsey, a neuro-surgeon, testified by affidavit: He examined plaintiff on March 3, 1955. The position of the pineal gland was found to be between 3 and 4 mm. (25.4 mm.'s equal one inch) to the left of the midline and at the cephalad (toward the head) limits of normal when visualized in the lateral view. There is no other evidence of cranial or intracranial pathology demonstrated on the skull series. An electroencephalogram was entirely negative. Plaintiff had a moderately severe concussion of the brain, but he has made a good recovery as evidenced by the fact that he has no changes in his electroencephalogram. The doctor thinks "the fact that [plaintiff] has had to change his work and go into business for himself is indicative that the headache of which he complains is real and is in all probability related to his injury" and that it probably will be permanent.

Dr. E. C. Funsch, a physician and surgeon specializing in traumatic surgery, testified: He examined plaintiff on March 2, 1955. He had him stand up and he bent forward to a right angle and had fairly good sideward movement. The only impairment of function of his back was that he did not move it in "complete limber way". The doctor's opinion was "that this man received a concussion, and he received those cuts about his head, and since then the various examinations, the negative encephalogram, and the negative reflexes at this time would tend to show that he didn't have any organic brain injury, that he had a shaking up, but there was no after effect as far as the organic portion is concerned, that is, he didn't have any hemorrhage or he didn't have any laceration. Frequently, after a concussion people have headaches and dizziness for quite some time, but in the absence of positive organic involvement, or in the absence of anything you can put your finger on, those generally clear up." The X-rays reflect that the lumbosacral disc space is narrower than normal. The vertebræ are closer together than they would be if they had a normal intervertebral disc between them. The doctor does not doubt he has had periodical trouble with his back, but did not see evidence of injury.

The evidence above narrated reveals a decided conflict of opinion between the medical experts testifying in behalf of plaintiff and those testifying in behalf of defendant, including the conclusions of the medical experts at the Veterans Hospital, as shown by its records placed in evidence by plaintiff. As stated, the propriety of the trial court's action must be determined from the evidence most favorable to defendant. Briefly, that evidence was that although plaintiff suffered a "moderately severe" concussion, there was no organic or other permanent injury to his brain; that the back and leg pain from which he suffered was not attributable to his injuries; that his eyes now function normally; and that the headaches and dizziness of which he complained at trial time would "clear up".

■ We have concluded that this evidence is substantial and that we cannot say as a matter of law it does not reasonably support the finding of the trial court.

Plaintiff has made no contention that if his injuries and loss of earnings are only of the extent shown by the evidence most favorable to defendant, the order of remittitur constituted an abuse of discretion. Neither has he cited us to any case wherein he claims that a final judgment of $10,000, involving injuries and loss of earnings as shown by the evidence most favorable to defendant in this case, would not be reasonably uniform with awards heretofore approved by this or appellate courts elsewhere for comparable injuries and loss of earnings. To the contrary he has cited us only to cases wherein awards ranging from $61,000 to $25,000 for injuries that were at least as great and in most if not all instances greater than the injuries shown by the evidence most favorable to plaintiff. They are not in point.

The order granting defendant a new trial is affirmed.

All concur.