**Edmund RAUCH (Plaintiff), Respondent,**

v.

**McDONNELL AIRCRAFT CORPORATION, a corporation, and W. H. Wermuth (Defendants), Appellants.**

No. 29539.

St. Louis Court of Appeals, Missouri.

June 18, 1957.

George E. Lee, St. Louis, Carter, Bull & Baer, St. Louis, of counsel, for appellants.

Hullverson & Richardson, St. Louis, for respondent.

RUDDY, Presiding Judge.

This is an action brought by plaintiff (respondent) Edmund Rauch, against defendants (appellants) McDonnell Aircraft Corporation and W. H. Wermuth, its employee, for damages for personal injuries sustained by plaintiff when an object known as a fixture was caused to drop on plaintiff's foot. A trial in the Circuit Court resulted in a verdict and judgment for plaintiff and against both defendants in the sum of $3,000. Both defendants have appealed.

Plaintiff's petition alleged that he was an invitee on the premises of the McDonnell Aircraft Corporation and that while there defendant Wermuth, an employee of the defendant McDonnell Aircraft Corporation, "caused, suffered and permitted a heavy object, probably what is known as a 'fixture,' to drop on plaintiff's foot" and that the incident described was the direct result of the negligence of both defendants.

Plaintiff's principal instruction required the jury to find that jigs or fixtures were placed on a two-wheel dolly and moved into a position on the dock of the defendant McDonnell Aircraft Corporation where they could be loaded into Rauch's truck, and that Wermuth undertook to help Rauch load such material onto his truck. Said instruction further required the jury to find from the evidence that Rauch stepped into his truck with his left foot after telling Wermuth to wait a moment while he straightened up some material in the truck so that it could receive such jigs or fixtures, and that while he was in that position his (Rauch's) right foot was on the dock near the lower end of the dolly, and that Wermuth then lifted one of such jigs or fixtures from the dolly, causing it to become overbalanced and to throw one or more of such jigs or fixtures onto Rauch's right foot, and that Wermuth knew or should have known that Rauch was in the position described above and that removal of a fixture was likely to cause the truck or dolly to become overbalanced and to drop its load as aforesaid, and that in removing such fixture or jig from the truck under the circumstances aforesaid, Wermuth failed to exercise ordinary care.

Defendants contend that the trial judge committed error when he failed to direct a verdict for defendants at the close of the evidence and when he failed to set aside the verdict and enter judgment for the defendants for the reason that the evidence wholly failed to establish an essential element of the plaintiff's case, namely, knowledge of the danger or likelihood that the alleged action by defendant Wermuth would cause injury to plaintiff. It is the position of defendants that the evidence in the case failed to supply any facts or circumstances which would warrant a finding or inference that defendant Wermuth either knew or should have known of the danger or likelihood of injury to Rauch.

This contention of the defendants requires an examination of the evidence. In our review of the evidence we must state the facts most favorable to plaintiff and must give to plaintiff all favorable inferences that may reasonably be drawn from those facts.

Plaintiff was engaged in operating a tool and die shop under the name of Rauch Tool Manufacturing Company. He had

operated this business approximately three years, and before that time he worked for the McDonnell Aircraft Corporation. In his business he rebuilt tools, jigs and fixtures. A jig or fixture is a tool used to hold parts which are being worked on by a mechanic. It was a part of his duties to obtain jobs and give estimates on the jobs and to instruct the foreman in his shop how the job was to be performed. In the performance of this work he had to be on his feet and had to drive his car considerably. Prior to the incident under scrutiny he had picked up, as he described it, pieces of work and would take them to his plant and perform the required work on these fixtures and then deliver them back to the McDonnell Aircraft Corporation.

Plaintiff testified that usually these fixtures were taken off his truck by employees of the McDonnell Aircraft Corporation. However, if it was a very small fixture, one that he could lift, he would take it off himself. On the occasion in question, namely, October 23, 1953, he went over to the McDonnell Aircraft Corporation to pick up some work and drove over in his truck. He backed the truck against the dock of the McDonnell Aircraft Corporation at which point the floor of the truck was approximately two feet lower than the dock. The back of the truck was to the north and the truck was facing south and had been backed up against the edge of the dock. Certain paper work had to be performed in advance of obtaining the fixtures and tools. He was given shipping slips which contained a list of the parts to be picked up. These shipping slips showed that seven parts were to be picked up that day. It was the duty of defendant Wermuth to get these fixtures ready for those who would pick them up and take care of the necessary paper work. It was also his duty to assist in getting the fixtures up to the edge of the dock and, if they were too heavy, to assist in loading them on the truck. Two of the fixtures to be picked up were large fixtures weighing

approximately one hundred and fifty pounds each, and the other five were jig fixtures which were estimated to weigh from fifteen pounds to twenty-five pounds each.

Plaintiff testified that on other occasions he had helped load material onto his truck. He testified that on this occasion, "I had to sign the paper work and the tools we loaded onto the barrel truck. Whether I helped him (Wermuth) or not I am not positive. I have gone over there so many times, I know there are times when I have helped him and there are times when he helped me. This time in question whether I helped him or not I wouldn't say for sure." Plaintiff admitted it was possible that he had helped to load the fixtures on the barrel truck.

The barrel truck referred to was also called a two wheel dolly. It was about three feet wide and about four feet long with hooked handles on one end. There was a steel lip on the other end of the barrel truck. This lip consisted of two forks on the outer edges of the barrel truck which were connected by a flat piece of steel across the top and the top edge of this flat piece of steel extended about five inches above the bed of the barrel truck. Two wheels are set back eight inches from the end having the steel lip. On the other end of the barrel truck close to the hooked handles two stands are provided, one on each handle, so that when the truck is set on the floor the two stands and the wheels are the same height. When the truck is set down on the wheels and on the stands, it provides a level surface on the top of the truck with the steel lip extending up five inches above the surface of the barrel truck. When the barrel truck is in this position, the foot of the truck containing the steel lip extends beyond the location of the wheels.

Wermuth testified that only the two large fixtures were loaded on the barrel truck and wheeled outside to the truck of plaintiff. However, plaintiff testified that all

seven tools were put on the truck and wheeled outside by Wermuth. The facts most favorable to plaintiff in this connection show that two large fixtures and five small fixtures or jigs were loaded on the barrel truck. In describing the position of the two large fixtures on the barrel truck plaintiff testified, "They were sitting longwise on the truck, * * * They were sitting length-wise on the truck."

Plaintiff further testified that the two large fixtures extended from the lip end of the barrel truck almost to the handles on the other end. He further testified that these two large fixtures were "possibly even overhanging the front end." By the front end of the barrel truck he obviously meant the end containing the raised steel lip. Plaintiff testified that the other five smaller fixtures "were just piled on top towards the front, * * * up near the blade." When plaintiff was asked if any of the smaller fixtures were toward the back of the barrel truck, he answered, "Not too much or he (Wermuth) couldn't have picked it up." In another place in his testimony plaintiff said the five smaller fixtures were stacked on top of each other near the fork or blade and were uneven.

Wermuth in his testimony contended that the smaller fixtures were not placed on the barrel truck, but that only the two large fixtures were placed on it. He further testified that the two large fixtures were placed "crossways" on the barrel truck and not "lengthways." When Wermuth was asked if it would have been possible to lay the two large fixtures lengthways on the barrel truck, he gave the following answer, "Not very good, as heavy as they were. * * * They make a pretty good load and we don't pile them on top of each other * * *." The two large fixtures were about three and one-half feet long, eight inches in width and about four or five inches high.

When the seven fixtures were loaded on the barrel truck Wermuth picked up the truck by grasping the handles and raised it enough to get the rear end of the truck off the floor and as Wermuth described it, he sort of scooted the truck along to the outside dock where plaintiff's truck was located. During this operation the fixtures remained in about the same position on the truck. When Wermuth was asked the extent to which he picked up the barrel truck by the handles, he said, "You needn't raise it too high; otherwise they might tilt over or slip off." The barrel truck was placed adjacent to plaintiff's truck and approximately parallel with the edge of the loading dock, with the handle end of the barrel truck slightly farther from the edge of the dock than the blade end of the barrel truck. The blade end of the barrel truck was approximately in line with the center of plaintiff's automobile truck.

There was something in plaintiff's truck that he wanted to move and put out of the way of the fixtures to be loaded. Plaintiff asked Wermuth to "wait, just a moment" or, as he testified, he said some words to that effect. Rauch then stepped into the truck with his left foot and his right foot remained on the dock at the left of the barrel truck. When Rauch stepped into the truck with his left foot Wermuth was standing on the dock at the handle end of the barrel truck. Rauch did not get into the truck with both feet. He testified that his right foot remained on the dock and was not in contact with the barrel truck in any way.

After Rauch stepped into the truck with his left foot and while he was looking in the truck, the barrel truck "up-ended," and tipped over causing the fixtures to fall off the barrel truck onto the right foot of Rauch. Rauch testified there were more than two tools on his foot. His right foot was pinned under the tools. In describing how the barrel truck up-ended Rauch stated the back end of the barrel truck "lifted up in the air and the front end tipped over." The first knowledge Rauch had of the incident was when he felt a pain in his right foot. He then looked up and saw the barrel truck up-ended and saw Wermuth

standing behind it at the handle end of the truck. When Rauch was asked what happened, he testified, "Mr. Wermuth picked up a tool on the upper end where he was standing and that off-balanced the barrel truck and it up-ended and slid off and hit me on the foot. The tools came off the truck and piled up on my foot." Rauch made an outcry when he felt the pain and as he looked up he saw Wermuth set something down on the dock which he (Rauch) described as a "drill jig or fixture." Rauch testified it was one of the tools on top of the load. Rauch did not see Wermuth pick up anything off the barrel truck. Wermuth ran around the barrel truck and helped pull the fixtures off of plaintiff's foot. Wermuth in describing what happened said the barrel truck "just got over-balanced." He was asked if he had anything in his hand at the time the barrel truck tipped over, and he said "I don't remember." He admitted that at the time his deposition was taken he was asked, "How did the dolly turn over?" and that he answered, "Well, it just got most of the weight on the front and it just raised up." He was also asked, "The rear end of it raised up, is that right?" and he answered "That is right." He further testified in his deposition that he saw the rear end of the barrel truck "tip up." It will be remembered that Wermuth maintained that only the two large fixtures were hauled to the dock preceding the accident. However, when he was asked how the five small fixtures were handled he replied, "I don't recollect." He expressed the thought they had been carried out by hand. Rauch sustained a comminuted fracture of the first metatarsal bone of the right foot.

█ There is no disagreement between plaintiff and defendants as to the applicable rule of law that governs defendants' liability for this injury. All the parties concede that in order for an act or failure to act to be negligent the person charged therewith must generally have, or be reasonably chargeable with, knowledge that it involved danger to another. 65

C.J.S. Negligence § 5, p. 350. This rule is so well known to the law that citation of other authorities is unnecessary. Plaintiff agrees that it was necessary for him to prove that Wermuth knew or should have known that injury of some kind might result to plaintiff when he removed the fixture from the loaded truck. In order to hold defendants liable for plaintiff's injury it is not necessary for plaintiff to prove that Wermuth had actual notice or knowledge of the likelihood of injury to plaintiff. It is enough if circumstances are shown to put an ordinarily prudent person on notice that an injury is likely to occur. Defendants insist there was no evidence which would permit even an inference that Wermuth had any reason to believe his action in removing one of the fixtures from the barrel truck would be likely to cause injury to plaintiff. We must disagree with this contention of defendants.

In support of their contention defendants propound three questions to this court. (1) What did Wermuth know of the danger as determined by what he said and what he did? (2) What did the evidence reveal concerning the physical facts as to the identity and position of the fixtures on the dolly? (3) What did the evidence reveal concerning the cause of the accident?

█ We will answer the second question first. Wermuth knew the weight of the various fixtures. He had handled them many times before. He either loaded them on the truck without any help or he had help from Rauch in the loading of these fixtures. In either event he knew the position of the fixtures on the barrel truck at the time they were loaded. He wheeled them out to the dock on the barrel truck and he certainly knew the position of the fixtures on the truck when he reached the dock where plaintiff's automobile was stationed. Plaintiff testified that the two large fixtures were sitting lengthways on the barrel truck and may have been overhanging the lip end. Plaintiff also testified that the five smaller fixtures were piled on top

of the two larger fixtures and near the blade end of the barrel truck. The blade end of the truck was at least eight inches beyond the wheels of the barrel truck. This testimony of plaintiff sufficiently identifies the fixtures and their position on the truck. If plaintiff saw them in this position, it is not unreasonable to infer that Wermuth also saw them in the same position. As a matter of fact Wermuth was in a better position than Rauch to know the identity and position of the fixtures on the barrel truck at the time of the accident. He had lifted one of the smaller fixtures off the barrel truck prior to the tilting of the truck and certainly saw the position of the remaining fixtures. However, there was nothing in the evidence to indicate that the fixtures were in any other position than that at the time of the loading. The evidence reveals that Wermuth must have known that the two large fixtures were placed lengthways in the barrel truck and that the five smaller fixtures were piled on top of the two larger fixtures near the blade end of the truck.

We will now answer the first question posed by defendants. Wermuth's knowledge of the instability of the barrel truck when so many fixtures were placed on it is confirmed by his own testimony. In recounting this testimony we are aware that Wermuth insists that only the two large fixtures had been placed on the barrel truck and that they were placed "cross-ways" and not "length-ways." However, we are bound to accept the testimony of plaintiff in this regard, that there were seven fixtures placed on the truck and that the two large fixtures were placed "length-ways" and that the smaller fixtures were piled on top of the larger fixtures near the blade end of the barrel truck. Wermuth admitted in his testimony that laying the fixtures lengthways was "not very good" as heavy as they were and that they make a pretty good load and that he does not pile them on top of each other. He also testified that if the large fixtures were laid lengthways over the lip they would never stay on balance. This testimony given by Wermuth demonstrates that Wermuth knew that placing the large fixtures lengthways and the smaller fixtures on top was dangerous and unsafe. Plaintiff's evidence shows the large fixtures were placed lengthways and the smaller fixtures were piled on top of the larger fixtures near the blade end of the truck. We are convinced that Wermuth knew or should have known of the danger that was present after loading the fixtures in the manner outlined above.

■ The third question involves the cause of the accident and encompasses the further question of whether or not Wermuth could have reasonably anticipated that the truck would tip and up-end when he removed the fixture. The fact that the barrel truck tipped and up-ended shows that at the time Wermuth lifted the one fixture off of the barrel truck there remained more weight between the wheels and the blade end of the truck than there was between the wheels and the handle end of the truck. As stated before, he knew the weight of the various fixtures, having handled them many times before. It has also been demonstrated that he knew or should have known the position of the several fixtures on the barrel truck and he must have been aware of the manner in which the weight of the fixtures was distributed, especially with reference to the wheels of the barrel truck. He knew the lip end of the barrel truck extended beyond the wheels eight inches. He certainly is charged with a knowledge of the law of gravity that if there was more weight between the wheels and the blade end of the barrel truck than there was between the wheels and the handle end of the barrel truck that such an uneven distribution of the weight would cause the truck to tip or tilt. The evidence shows that the smaller fixtures were piled on top near the blade end of the barrel truck and that Wermuth picked up a fixture on the handle end of the truck. It was the removal of this fixture from the barrel truck that

caused the truck to upset and spill some of the fixtures on the foot of plaintiff.

The evidence in this case clearly justifies the inference that the barrel truck tipped over and upended, as explained by Rauch, because the load at the blade end of the barrel truck was heavier than the load at the other end of the truck after the fixture was picked up by Wermuth. We are of the opinion that this could have been reasonably anticipated by Wermuth. We think there was sufficient evidence from which a jury could find that a reasonably prudent person would have anticipated the likelihood of the barrel truck tipping when the weight on the handle end of the barrel truck was reduced through the removal of the fixture by Wermuth. Also, we think there was sufficient evidence from which a jury could find that Wermuth should have foreseen that if the barrel truck did upend and tip that plaintiff's right foot was in a position to be injured from the falling fixtures. We are of the opinion that this was such an occurrence as could have been foreseen or anticipated by Wermuth. We think it is reasonable to hold that Wermuth in the exercise of ordinary care under the facts and circumstances as revealed by the evidence would have anticipated such a happening and taken adequate precaution against it by waiting until Rauch's foot was out of the way or by removing a fixture from the blade end of the barrel truck. Such a holding on our part is not based on speculation or conjecture and in our opinion is wholly in accord with the physical law and the physical facts as disclosed by the record in this case. We think there is ample evidence to support the inference that Wermuth knew or should have known that his action would cause injury to Rauch.

The defendants in their brief state that they have made a diligent search and found no Missouri case similar to this case. Also, we have been unable to find a case factually similar to this case. Defendants do cite a large number of cases that rule on the question of foreseeability or actual or constructive knowledge of the danger present. A review of these cases would add nothing to this opinion. The applicable rule of law as announced in these cases and as set out earlier in this opinion is not challenged by plaintiff. Plaintiff and defendants differ on the application of the rule as announced in these cases to the facts in the case under review. However, among the cases cited by defendants, wherein the issue of foreseeability was held to be a jury question, are some that lend support to our holding in this case.

In the case of Howard v. S. C. Sacks, Inc., Mo.App., 76 S.W.2d 460, the plaintiff was a carpenter foreman working for a construction company. A box containing tile was delivered by a heavy hauler for the defendant electrical contractor which was installing electrical work in the main dining room and in an electric oven in the basement of a hotel that was under construction. The box was brought into the main dining room of the building. Before the accident occurred plaintiff had told the foreman for the defendant company that the box was shaky and was unsafe and he wanted the foreman to lay the box down on its side on the floor. The foreman objected and told plaintiff it was too heavy to lay down. After complaining again about the place and position of the box plaintiff testified that he did not see the position to which the box was later moved. In describing the accident plaintiff stated that the box fell over and caught him on the leg. He testified that he did not see the box and did not see it under the scaffold at the time it fell on him and that the first knowledge he had of the box being under the scaffold was when he and the other men started to move the scaffold. Defendant argued that there was no proof that the box was unstable or insecure in its last position under the scaffold immediately before it fell; that in view of the specific charge in plaintiff's petition that the box was placed by defendant in an unstable position, defendant contended that

plaintiff utterly failed to make a case for the jury. The court held that under the evidence plaintiff was clearly entitled to have the question of defendant's negligence submitted to the jury, pointing out that plaintiff had called the attention of the electrical foreman to the shaky condition of the box when it was first brought in. The court held:

"We are of the opinion that the jury could very reasonably have concluded that a 'top heavy' box, five feet high, five and a half feet long, and of a thousand pounds weight, resting on a narrow twelve-inch edge upon a floor on which there was rubbish and debris, and which was shown to be 'shaky' and 'wobbly' in two other places within a half hour preceding its fall, would be insecure and unstable and be likely to fall at the slightest touch when placed in a similar position on its narrow edge on the same floor under the scaffold." 76 S.W.2d loc. cit. 464.

In this opinion the court quoted from Loehring v. Westlake Const. Co., 118 Mo. App. 163, 173, 94 S.W. 747, 750, as follows:

" * * * Whenever circumstances attending the situation are such that an ordinarily prudent person could reasonably apprehend that as the natural and probable consequences of his act, another person, rightfully there, will be in danger of receiving an injury, a duty to exercise ordinary care to prevent such injury arises, and if such care is not exercised by the party on whom the duty rests and injury to another person results therefrom, liability on the part of the negligent party to the person injured will generally exist, in the absence of any other controlling element or fact, and this too, without regard to the legal relationship of the parties."

The court held that it was for the jury to say whether or not defendant's foreman could reasonably have anticipated that the placing of the box on its narrow edge under the scaffold would be likely to cause injury to plaintiff or the other carpenters who were required in the performance of their duties to move and use the scaffold from time to time.

In the case of Bennett v. Crystal Carbonate Lime Co., 146 Mo.App. 565, 124 S.W. 608, plaintiff recovered for personal injury received by him through the alleged negligence of the defendant. Plaintiff was engaged as a laborer in defendant's stone quarry and was seriously injured as a result of a large stone rolling upon his limb. He was engaged under the immediate direction of his foreman in prying a particular stone which had theretofore been held in position by the one which plaintiff sought to remove.

The court found that the evidence tends to prove that the act in which the plaintiff was engaged at the time did not threaten immediate peril although the result might have been foreseen by the foreman who directed the work. The body of the stone which plaintiff was working on was cracked and shattered by heavy charges of dynamite which failed to crumble the rock and some of it remained standing as before, that is to say, that it was not scattered over the floor of the quarry but remained in position shattered and cracked throughout. Plaintiff was ordered to "bar out that rock" indicating a particular stone near the corner of the body of the large rock and about two feet above the floor of the quarry. Plaintiff hesitated to follow the order and the foreman repeated the order, whereupon plaintiff inserted the crowbar and lifted the stone from its position. In the course of doing this another stone supported by the one being removed rolled out of the mass of rock upon the leg of plaintiff and inflicted the injury. The court said:

"Now, the precise question for decision does not relate alone to the fact that the plaintiff was engaged in rendering a place reasonably safe in

itself to be an unsafe place, but it reveals the fact as well that the master ordered him to pry out a certain rock, the result of which might have been foreseen by the exercise of ordinary care on the part of the master as fraught with probable peril to plaintiff, and which danger appears not to have been obvious or patent to the plaintiff. Although the mass of stone had been shattered by the 'pop shot' blast referred to, it stood intact and appears to have been reasonably safe in and of itself. The danger involved, instead of residing in the place as it stood, rather inhered in the act of prying out and removing the particular stone on which rested another and precipitating it forward. It is true the act was performed by the plaintiff himself, but it was at the urgent direction of the foreman, who, according to the testimony, could, by exercising ordinary care, have seen the probable result which was not obvious to the plaintiff." 124 S.W. loc. cit. 611.

The court held that the foreman could by exercising ordinary care have seen the probable result. While this case is not wholly similar in facts to the case under review, the circumstances under which the foreman was held to have been able to foresee the probable peril to plaintiff when removing the particular stone are not unlike the circumstances in this case. In the Bennett v. Lime Co. case the foreman was in a position to see that if the stone was removed another stone behind it was likely to fall on plaintiff. In our case defendant Wermuth knew the position of the fixtures on the truck, having helped to load the barrel truck and having wheeled out the barrel truck to the dock adjacent to plaintiff's automobile truck and Wermuth knew that the smaller fixtures were stacked at the blade end of the truck and, therefore, he should have seen that the predominant weight was toward the blade end of the truck and that the removal of a fixture from the other end of the truck would be likely to up-end the truck. We hold that the trial court did not err in failing to direct a verdict for the defendants at the close of the evidence and in failing to set aside the verdict and enter judgment for the defendants.

The next contention presented by defendants is that the trial court erred in giving and reading to the jury plaintiff's instruction on the measure of damages. Defendants state this instruction was erroneous and prejudicial because: (a) it purported to authorize an award by the jury as to permanent injuries, when there was no substantial evidence to warrant a finding of, or award for, such permanent injuries, (b) it required the jury to assess or award damages for both future pain and suffering and for permanent injuries, which constituted a duplication of awards, for the reason that the evidence showed that the plaintiff's only injury would not manifest itself in the future otherwise than by pain and suffering, (c) it permitted the jury to award damages for impairment of plaintiff's ability to work and labor, which was outside the scope of the pleadings and wholly unsupported by the evidence.

Defendants concede that the pleadings and the evidence warranted the submission of the first three items of this instruction, namely, (1) pain and suffering since the date of the accident, (2) pain and suffering in the future and (3) the value of medical care. It is the fourth item of this instruction to which defendants direct their complaint. It reads as follows:

"*Fourth*, such distinct, permanent injuries, if any, as you find from the evidence that Mr. Rauch suffered as a result of such occurrence, taking into consideration in this connection, if you wish, such impairment, if any, in Mr. Rauch's ability to work and labor as you find from the evidence that he suffered as a result of such occurrence."

This contention of defendants requires a review of the testimony bearing on the

permanent nature of the injuries sustained. The accident occurred October 23, 1953, at which time plaintiff sustained a comminuted fracture of the first metatarsal bone in his right foot. He was treated by members of the medical staff of the McDonnell Aircraft Corporation who x-rayed the foot and found the fracture and thereafter applied a cast that extended midway between the ankle and the knee. He remained away from his shop for several days. He made several other visits to the members of the medical staff of the McDonnell Aircraft Corporation and thereafter became dissatisfied with their services and then went to Dr. William S. Stephens.

Plaintiff testified that he changed doctors because the foot continued to pain him. Dr. Stephens removed the old cast and after x-raying the foot applied a new cast. Plaintiff was instructed to use a crutch if he had to walk. He testified he kept on trying to continue his work. He took care of the phone and other administrative details of his office and at times would hobble into the shop and check over jobs with the foreman. After the cast was removed he had to have his shoe raised on the inside to support the foot. For some time after the accident the foot would pain and swell every evening. He "propped it up" and "soaked it in hot water." Before the accident he played golf and danced frequently. Since the accident he has not played golf, and, while he does some dancing, he is unable to dance as much as before because of pain in the foot. At the time of the trial the foot didn't ache or pain all of the time. However, if he did a lot of walking the foot would swell in the evening and become uncomfortable. He continues to experience some pain. He testified that the swelling continues and had not improved in the year prior to the trial. He was asked if his business suffered as a result of this occurrence and he replied that it had, but he was unable to give the amount of lost earnings. We have pointed out that in the performance of his work he had to be on his feet and had to drive his car considerably.

Dr. William A. Stephens, an orthopedist, testified that he first saw plaintiff about two weeks after the accident occurred. Plaintiff's right foot was swollen quite a bit and there was considerable tenderness around the medial longitudinal arch of the foot. An x-ray revealed a comminuted fracture of the shaft of the first metatarsal bone. He described this bone as one of the five major bones of the foot. The alignment of the bone was good. The x-ray gave no indication of soft tissue injuries. However, he testified that one may have soft tissue injuries in the blood vessels, muscles, tendons and cartilages which do not show on the x-rays. He described the fractured bone as an important part of the arch of the foot. Subsequent x-rays disclosed that the healing process was progressing nicely. He expected that in the normal course of events the healing of the bone would become complete. He further testified that even though the bone has healed perfectly there may be a persisting injury or disability of the foot. On June 13, 1954, approximately eight months after the accident, when plaintiff was again examined by Dr. Stephens, plaintiff seemed to be getting along satisfactorily, was limping a little and complained of some pain in the right foot. Dr. Stephens found very little swelling and testified there was a slight restriction of the flexibility of the foot on this occasion. He made a final examination of plaintiff's foot on or about the 12th day of May, 1955, and found a little tenderness on palpation under the first medial bone. There was no swelling although plaintiff had told him some swelling took place toward evening. He found slight restriction of the flexibility of the foot at that time. Dr. Stephens stated that just beneath the shaft of the first medial bone was a rather important muscle which is the abductory muscle of the great toe. In the same area is a short flexor muscle and some important blood vessels. He explained that the effect of a force sufficient to fracture a medial bone can be transmitted to the adjacent bone, that is, the ends of that bone which go to make up the longitudinal

arch. When Dr. Stephens was asked his opinion as to what was causing the pain and swelling when Rauch stands on his foot for any length of time, he answered, "Well, I think it is due to the stretch or injury of the ligaments about the joints of the first metatarsal bone comprising the medial longitudinal arch." He gave it as his opinion that plaintiff had a permanent partial disability of his right foot and that he will continue to have some pain in this foot in the future.

On cross-examination he stated that in his opinion some of the pain may be due to stretch on the ligaments that support the bone and he further stated that he thought some ligamental sprains are worse than fractures. Further, on cross-examination, in explaining his opinion that plaintiff suffered partial disability he said it had to be based almost entirely on plaintiff's complaints. He further explained that the strain of the ligaments of the longitudinal arch was enough to give plaintiff some disability, pointing out that plaintiff was a heavy man. He further gave it as his opinion that the disability was permanent "since it has lasted this long."

The first ground of complaint against plaintiff's instruction on the measure of damages is that there was no substantial evidence to warrant a finding by the jury that plaintiff has sustained permanent injuries. We think this contention of the defendants must fail. Plaintiff's testimony clearly shows that the right foot continues to swell in the evening, especially when he has done a lot of walking. The testimony also shows that this condition has not improved within the year prior to the date of trial. More than one and one-half years after the accident occurred, Dr. Stephens found some restriction of the flexibility of the foot. Also, Dr. Stephens stated that the swelling which plaintiff was continuing to experience in his foot was due to the stretch or injury of the ligaments about the joints of the first metatarsal bone comprising the medial longitudinal arch. He gave it as his opinion that such sprains are worse than fractures. He also testified that in his opinion plaintiff has sustained a permanent partial disability of his right foot. It is true that he said this opinion is based almost entirely on plaintiff's complaints, but it will be recalled that he testified that one may have injury to the muscles, tendons and cartilages of the affected area and he further explained that the effect of a force sufficient to produce a fracture sustained by plaintiff can be transmitted to the adjacent bone. It was his opinion that plaintiff likely has had a strain of the longitudinal arch which was enough to give him some disability.

■ Defendants contend that in order to recover damages for permanent injuries the permanency of the injury must be shown with reasonable certainty and while absolute certainty is not required, mere conjecture or likelihood, or even a probability of such injury will not sustain the allowance of damages therefor, citing Weiner v. St. Louis Public Service Co., Mo., 87 S.W.2d 191. We are of the opinion that there is sufficient evidence in this record from which a jury may find that plaintiff has sustained some permanent injury.

■ The next ground of complaint against plaintiff's measure of damages instruction is that plaintiff's evidence as to alleged permanency was limited to the possible existence of pain and swelling in the future and, therefore, the assessment of damages for alleged permanent injuries would constitute a duplication of the award under paragraph second of the instruction for future pain and suffering. Defendants contend that where plaintiff's permanent injury does not manifest itself "otherwise than by pain and suffering" and a diminution of earning power that recovery of damages for permanent injuries as such may not be had. Van Campen v. St. Louis-San Francisco Ry. Co., 358 Mo. 655, 216 S.W.2d 443. They contend that a submission of future pain and suffering and of permanent injuries that do not manifest themselves in

some other way than through pain and suffering amounts to a permission to the jury to assess "double recovery" for future pain and suffering. A sufficient answer to this contention is to point out that the permanent injury of plaintiff does manifest itself other than through pain and suffering and a diminution of earning power. The evidence shows that plaintiff's foot continues to swell and that his ability to walk to the extent he could before the accident has been reduced and that when he does walk a lot his foot swells. The evidence further shows that at the time of the last examination by Dr. Stephens there was restriction of the flexibility of the foot. In the opinion of Dr. Stephens there remained some ligamental sprain which he described as worse than fractures. We are of the opinion that there was sufficient evidence from which the jury could find that the plaintiff had sustained a permanent injury that manifested itself "otherwise than by pain and suffering."

The final ground of complaint against this instruction is that the jury was authorized to consider plaintiff's ability to work and labor, which consideration was outside the scope of the pleadings and was unsupported by the evidence. The instruction did not submit plaintiff's ability to work and labor as a separate item of damages. It merely advised the jury that, if it wished, it could consider plaintiff's impairment, if any, to work and labor in connection with its consideration of whether or not plaintiff sustained permanent injuries. The instruction did not submit future loss of wages or impaired earning capacity. The cases make a distinction between the diminution of impaired ability to work and labor and the loss of earnings. Kleinlein v. Foskin, 321 Mo. 887, 13 S.W.2d 648; Steinkamp v. F. B. Chamberlain Co., Mo.App., 294 S.W. 762; Perrigo v. City of St. Louis, 185 Mo. 274, 84 S.W. 30. The cases hold that there may be a recovery for impaired ability to work and labor, although there may in fact be no loss of earnings. Inasmuch as plaintiff did not submit "impaired ability to work and labor" as a separate item of damages, it is immaterial that it was not pleaded. Was there evidence to support it? The evidence demonstrates that plaintiff cannot do, to the same extent, some of the things he did before the accident, such as dance and play golf. If his activities in this direction are impaired, because of his inabilty to walk and be on his feet as much as before the occurrence, his ability to work and labor would also be impaired, inasmuch as he testified he had to walk a lot in his present employment. The evidence of the tendency of his foot to swell in the evening, together with the aforesaid evidence are sufficient from which the jury may find that plaintiff has sustained some impairment of his ability to work and labor. We find no error in the instruction.

Accordingly, the judgment is affirmed.

ANDERSON, J., and SAM C. BLAIR, Special Judge, concur.