Winfred BONE, Respondent,

v.

**GENERAL MOTORS CORPORATION, a Corporation, Appellant,**

and

Robert Watkins, Defendant.

No. 46793.

Supreme Court of Missouri,

Division No. 2.

April 13, 1959.

Francis R. Stout, Richard M. Stout and Kent E. Karohl, St. Louis, Wilton D. Chapman and Thomas W. Chapman, St. Louis, for appellant.

Hullverson, Richardson, Hullverson & Jeans, Eugene B. Overhoff, Orville Richardson, St. Louis, for respondent.

EAGER, Judge.

Plaintiff, a switchman for the Terminal Railroad Association of St. Louis, was injured while working inside the General Motors Plant at Natural Bridge Road and Union Avenue in the City of St. Louis. He sued General Motors Corporation and the driver of the truck which struck him; the driver was an employee of General Motors. The verdict of the jury was for the driver, Robert Watkins, and against General Motors in the sum of $20,000. The trial court required a remittitur of $2,500, which plaintiff duly entered; the motion for new trial being thereupon overruled, General Motors appealed.

The truck in question was one of several leased by General Motors (which we shall hereafter refer to as the defendant) from one Wallach, a scrap iron dealer; it was used for hauling trash. It will be necessary to describe the truck in some detail because of the unusual nature of the injury. It was a dump truck, a '54 Chevrolet, with "lots of miles on it"; it had been used to haul trash and rubbish, and showed considerable use. Watkins had driven it before, but for how long is not shown. The rear doors or tail gates were of steel, hinged at the outer sides; when they were closed a metal bar or latch, fixed to one door, was dropped into a metal "slot" on the other door to keep them closed. On this particular truck there was no other method of keeping the doors closed, such as a pin or locking device, and nothing to keep the bar or latch from bouncing. On the day in question, Jan. 3, 1956, at about 5:10 p. m. Watkins had taken a load of trash to the plant dump, had emptied it, and was returning to the plant; he testified positively that he had fastened the doors with the metal bar before leaving the dump.

Plaintiff was a member of a switching crew which was switching cars in the plant; at the point in question two switch tracks running east and west crossed a paved asphalt roadway running north and south. Plaintiff had seen these trash trucks go by occasionally for months. On this occasion he had been assigned by his foreman to "guard the crossing," or to see that no passing vehicles or persons were struck in the switching operation. He was standing near the west edge of the paving between the tracks; facing north, he saw the truck coming from that direction, at 15–20 miles per hour; he turned to his left and looked to the west to see if the way was clear of switching cars; just as he turned back he was struck by the swinging right rear door of the truck. He had not previously seen the door, and the predetermined course of the truck would have missed him by two feet or more. He was knocked against a pile of equipment and fell thence to the ground. Initially, he was struck on his right shoulder and, as he stated it, the "lower and upper part of my stomach"; his back hit the pile of equipment. Someone stopped the truck and the driver came back; he had not previously known that he struck anyone. Plaintiff was taken in the switch engine to the "yards"

in the plant, and thence to the Missouri Pacific Employees Hospital.

The crossing immediately involved was built up with timbers to the approximate level of the asphalt roadway. No gross irregularities in the crossing are obvious in the photographs, and Watkins testified that it was smooth. He further testified: that on the way back from the dump he had crossed various tracks and that there were "some holes in the road," and "some was pretty deep, too"; that he drove slowly because he had been instructed to do so, and that he was traveling around 10 miles an hour; that the doors had never opened on him before, and that he did not know what made them come open on this occasion; that he had not heard or felt any unusual motion of the doors or tail gates prior to the injury; that they had to fasten the doors to keep them from swinging and hitting new cars; that it was a part of his duty to keep the doors closed. Watkins had driven trucks for several years. There was no evidence of any inspection, repair or maintenance of this truck by anyone. Defendant's evidence consisted only of the testimony of its employee Watkins and certain medical evidence. The case was pleaded and submitted on the res ipsa theory.

Plaintiff was 35 years of age and married; he had been in railroad work for some years, and had been a switchman for the Terminal since 1950. He was in the hospital for a month on the first trip; he did no work until May or June, 1956 (the exact date being uncertain); he apparently worked part time in June and July, but was hospitalized again from July 31–Aug. 8, 1956; he did no work in August, beginning to work again in September; on July 3, 1957, he was again hospitalized for 5 days. Thereafter he worked to the time of trial, but he testified that he laid off occasionally for a day or two when he did not feel well enough to work. He was doing some over-time work. His principal injuries consisted of trauma to the soft tissues of his lower back and a "paralytic ileus," or cessation of the peristaltic contractions of the lower bowel. Immediate symptons of the ileus were much distension or bloating of the abdomen and a cessation of normal bowel movements, resulting from a paralysis of the automatic or sympathetic nervous system which stimulates the muscular action. This was said by one of the hospital physicians to have been due to contusion of the abdominal wall; one of plaintiff's medical witnesses, who had also attended him in the hospital, stated that the ileus could, with reasonable medical certainty, be said to have been caused by the blow; plaintiff's family doctor stated the opinion that the condition resulted from the trauma of this injury to the sympathetic nervous system, as evidenced further by plaintiff's continued constipation; that he could account in no other way for the persistence in the symptoms; also, that this condition was likely to cause trouble indefinitely. The acute ileus, characterized by distension and like symptoms, seems to have disappeared by April or May, 1956, but plaintiff testified that protracted and exaggerated constipation had continued to the time of trial, with occasional bloating, and that he was required to take enemas about twice a week. He further testified that he had never been troubled with this prior to his injury.

One of plaintiff's witnesses, Dr. Robert Funsch, had been called into consultation at the hospital as an orthopedist; he had also examined plaintiff shortly prior to trial. He testified that there was a "contracture" of soft tissues (a shortening and fibrosis in ligaments and muscles) and tenderness in the lumbar area with a loss of normal flexibility and restriction of movement; that such a condition develops as an end result of demobilization or nonuser in the presence of pain, and that it could have been caused by the present injury; that plaintiff might well have further difficulty with his back, particularly from heavy work or in inclement weather, or when tired. The family doctor (Ciapciak) testified to restricted motion in the lower back, tenderness and muscle spasm in the lum-

bar area, all resulting from trauma, and with "irreparable" injury to the soft tissues, tendons and nerves. He testified that, in view of the treatments already received, plaintiff would continue to have trouble for an indefinite period; and that his back condition was permanent. One of defendant's medical witnesses testified that plaintiff would have some slight permanent disability by reason of the restricted motion in his lumbar spine, which he thought should not interfere with his work as a switchman. Some indication was noted in X-ray plates of an osteochondritis, or developmental irregularity, in the first and second lumbar and lower thoracic vertebrae (an area where there is comparatively little movement), but there was evidence for plaintiff that his pain and discomfort were due to his injury and not to this pre-existing condition. The same may be said of possible hypertrophic changes noted in the fifth lumbar and first sacral vertebrae, though it was admitted that one or both of these pre-existing conditions might have been aggravated by the injury. Plaintiff's back injury was the occasion for his last two hospital admissions and for the out-patient treatments; it also caused most, if not all, of the time lost from work after the first hospitalization. Treatments for his back consisted of heat, physical therapy, exercises, electrical treatments and medication. Plaintiff testified: that his back still hurt him considerably, worse at some times than at others, that his legs bothered him when he sat still "too long"; that he still used home treatments and made an occasional visit to his family doctor; that his fellow workers helped him some with his work; and that he had lost approximately 37 days of work since November, 1956, including the third hospital visit. He earned $4,808.95 in 1955, $2,356.16 in 1956, and $3,663.50 for 9 months of 1957. The record fairly showed a loss of earnings of from $2,500–$3,000.

Plaintiff admittedly sustained an injury to his right shoulder in this occurrence; no bones were broken there or elsewhere. He still complained at trial time of difficulty with the shoulder when performing the heavier parts of his work. Considerable testimony was adduced of the presence of a protrusion or ventral hernia on plaintiff's upper abdomen, running from the end of the breastbone to the umbilicus. This was said to protrude upon certain types of exertion and to be due to a separation of muscles. One of plaintiff's medical witnesses attributed this to his present injury; the other thought that it could be so caused, but that, if so, one would expect much evidence of violence in that area. Technically, an issue for the jury was made on this element of damage, though not very impressively. Plaintiff had previously sustained two or three relatively minor injuries; these were not shown to have sufficient connection with his present condition to require elaboration here. His medical expense was largely paid through his employer or the employees' association; his family doctor testified that the value of his services was $300.

Defendant insists that it was error to submit this case on the res ipsa loquitur doctrine, and many cases are cited pro and con. It would be merely repetitious for us to review the doctrine in detail; it has been so well analyzed, defined and discussed in meticulous detail in many Missouri cases that we could add little. See: McCloskey v. Koplar, Banc, 329 Mo. 527, 46 S.W.2d 557, 92 A.L.R. 641; Layton v. Palmer, Mo., 309 S.W.2d 561; Cruce v. Gulf, Mobile & Ohio R. Co., 358 Mo. 589, 216 S.W.2d 78; Turner v. Missouri-Kansas-Texas R. Co., 346 Mo. 28, 142 S.W.2d 455, 129 A.L.R. 829; Jones v. Terminal R. Ass'n, Mo., 242 S.W.2d 473; Maxie v. Gulf, Mobile & Ohio R. Co., 356 Mo. 633, 202 S.W.2d 904; Adams v. LeBow, 236 Mo.App. 899, 160 S.W.2d 826; Adam Hat Stores, Inc. v. Kansas City, Banc, Mo., 316 S.W.2d 594. More specifically, defendant claims (a) that it did not have exclusive, or sufficient, control of the truck, and (b) that it was not responsible for the maintenance of the railroad crossing involved as an in-

strumentality. Pursuing these contentions counsel argue: (a) that the truck was leased to defendant, that the terms of the lease were not shown, that it was not shown how long defendant had used it, or that it had any duty of repair or maintenance; (b) that this particular railroad crossing may have been unusually rough, and that it was the duty of the Terminal Railroad to maintain it. In recent years it has been established that a plaintiff in a res ipsa case need not negative every reasonable theory of causation except that of defendant's negligence. Cruce v. Gulf, Mobile & Ohio R. Co., 358 Mo. 589, 216 S.W.2d 78, 81; Warner v. Terminal R. Ass'n of St. Louis, 363 Mo. 1082, 257 S.W.2d 75; Hanson v. Dalton Coal & Materials Co., Mo. App., 264 S.W.2d 897, 903; Layton v. Palmer, Mo., 309 S.W.2d 561; Parlow v. Carson-Union-May-Stern Co., Mo., 310 S. W.2d 877; Shafer v. Southwestern Bell Telephone Co., Mo., 295 S.W.2d 109. It is true that plaintiff must present more than a case of equal probabilities—one with liability and one without. Hart v. Emery-Bird-Thayer Dry Goods Co., 233 Mo.App. 312, 118 S.W.2d 509; Frazier v. Ford Motor Co., 365 Mo. 62, 276 S.W.2d 95. " 'The attendant facts must raise a reasonable inference of defendant's negligence * * *.' " Warner v. Terminal R. Ass'n, supra [363 Mo. 1082, 257 S.W.2d 79]. Here the defendant was, and had been, using this truck in its normal business operations; it was driven by its employee. Defendant was certainly in control of the truck at the time of this occurrence. See Turner v. Missouri-Kansas-Texas R. Co., 346 Mo. 28, 142 S.W.2d 455, 460, 129 A.L.R. 829. From that control a duty arose to prevent injury from its operation. The mere fact that the making of material alterations or repairs might have been the duty of the owner (if so) does not, in our opinion, alter the situation. Defendant could use the truck in its then condition, taking the consequences, or refrain from using it. It is obvious that one may not borrow or lease an instrumentality with a patent and dangerous defect and use it with impunity, merely because

someone else may have had the legal duty to maintain it. We are not assuming a defect here, but are merely answering the "control" argument. It would seem hypertechnical to say that defendant, because it was a lessee, could not have installed a fastener or locking device of some type on these doors, had it desired. Defendant has made no explanation of this occurrence. In certain Missouri cases lessees have been held liable for negligence under the res ipsa doctrine, upon the theory that their immediate, though concurrent, control or right of control was sufficient. Walsh v. Southwestern Bell Telephone Co., 331 Mo. 118, 52 S.W.2d 839; Barb v. Farmers Ins. Exchange, Mo., 281 S.W.2d 297, 303; Kelly v. Laclede Real Estate & Inv. Co., 348 Mo. 407, 155 S.W.2d 90, 138 A.L.R. 1065. There may be a concurrent control or right of control over an instrumentality, so that either or both of two parties are liable; and the rights of recovery may be upon differing factual theories. (See cases just cited.) Here we need not rule out all negligence of Wallach, the lessor; we have no doubt, however, that defendant had such immediate, active and effective control of this truck, as was sufficient to answer that requirement of the res ipsa doctrine; its actual control would certainly include a right of inspection and, if such were deemed necessary, it could refuse to use the truck. Turner v. Missouri-Kansas-Texas R. Co., supra. The other element of alleged noncontrol, (b) above, was the railroad crossing. We may dispose of that briefly. Such evidence as there was, including both testimony and photographs, was to the effect that this crossing was smooth. The roughness disclosed in the course of travel of the truck consisted of holes in the plant road, somewhere out beyond the crossing and toward the dump. It would be rank speculation to hold that the condition of this private crossing was such an effective cause as to exclude the application of the doctrine here, even if it be the duty of the Terminal to maintain the crossing (which is not shown).

Many possible specific causes of this occurrence could be conjured up by a nimble mind. The only witness, Watkins, said he had no knowledge of the cause. But it is not seriously urged that this was not such an occurrence as would not ordinarily happen in the absence of some negligence; and this, we think, is apparent from common knowledge and experience. For similar instances in which the doctrine was held applicable see: Noce v. St. Louis-San Francisco R. Co., 337 Mo. 689, 85 S.W.2d 637 (section laborer killed by piece of hub liner thrown from passing locomotive 10–15 feet away); Layton v. Palmer, Mo., 309 S.W.2d 561 (bale of hay falling from oncoming truck); Whittle v. Thompson, 352 Mo. 637, 179 S.W.2d 22 (plaintiff struck by swinging door of refrigerator car); Turner v. Missouri-Kansas-Texas R. Co., 346 Mo. 28, 142 S.W.2d 455, 129 A.L.R. 829 (same); Thompson v. St. Louis Southwestern Ry. Co., 243 Mo. 336, 148 S.W. 484 (one rightfully on station platform struck by a protruding freight car door); Hanson v. Dalton Coal & Materials Co., Mo.App., 264 S.W.2d 897 (wheel came off truck causing collision); Evans v. Missouri Pacific R. Co., 342 Mo. 420, 116 S.W.2d 8 (pedestrian struck by some object projecting from passing train). The discussion in the Turner case is particularly applicable here.

Defendant contends further that the doctrine should not be applied here because our Code of Civil Procedure and its permitted methods of discovery afford to plaintiff an equal opportunity to discover the "cause of the casualty," citing the dissenting opinion in Adam Hat Stores, Inc. v. Kansas City, Banc, Mo., 316 S.W.2d 594. Thus, counsel seek to distinguish cases decided prior to the effective date of the Code. Our court has, at least twice, disallowed this contention. Warner v. Terminal R. Ass'n of St. Louis, 363 Mo. 1082, 257 S.W.2d 75, 80; Jones v. Terminal R. R. Ass'n, 363 Mo. 1210, 258 S.W.2d 643, 645. The Warner case contains an adequate discussion of the point, and those interested may read it. The Adam Hat Stores case was founded on facts so wholly dissimilar to these that a discussion of it would be profitless here; and the passing remark in the dissenting opinion (in which this writer concurred) changed no law. The contention is denied. In summary we find no error in applying the res ipsa doctrine here.

■ Plaintiff's damage instruction No. 8 submitted: *"Fourth,* such distinct, permanent injuries as you find from the evidence that Mr. Bone has suffered as a result of such occurrence, taking into consideration in this connection, if you wish, such impairment, if any, of Mr. Bone's ability to work and labor as you find from the evidence that he has suffered as a result of such occurrence." Defendant claims error in the inclusion of the element of impairment of the ability to work and labor, saying that there was no evidence to support it, and that plaintiff was working regularly, performing all duties of his occupation and sometimes working overtime. Certainly there was no evidence of a general inability to work, but there was evidence that plaintiff was having some difficulty in performing the heavier parts of his occupation, that he received some help from others, that he occasionally took time off on account of his back condition, and that he might well have difficulty with his back in the future, particularly from heavy work or in inclement weather; one medical witness stated that his back condition was "permanent." In this situation there was no error in submitting the element of future impairment of the ability to work. An impairment of the capacity or ability to work has generally been distinguished from a future loss of earnings, and a recovery may be had for the former without specifically showing the latter, Donahoo v. Illinois Terminal R. Co., Mo., 300 S.W.2d 461, 466–467, and cases cited; Baker v. Norris, Mo.App., 248 S.W.2d 870, 875; Rauch v. McDonnell Aircraft Corp., Mo.App., 303 S.W.2d 226, 238; Kleinlein v. Foskin, 321 Mo. 887, 13 S.W.2d 648, 657. This dis-

tinction is made on the theory that an impairment of the *power* to work is an injury to a personal right " ' * * * wholly apart from any pecuniary benefit * * *.' " Wolfe v. Kansas City, 334 Mo. 796, 68 S. W.2d 821, 822. In Guiley v. Lowe, Mo., 314 S.W.2d 232, cited by defendant, this distinction was not noted (perhaps inadvertently, by this writer), but the damage instruction was clearly erroneous because of the submission of medical expense and loss of earnings with no sufficient evidence to support either element. We note also that in the present case there was ample evidence of past work and earnings and of loss of earnings, if that be an element of any future impairment by contrasting the past and future ability to work. Seymour v. House, Mo., 305 S.W.2d 1, loc. cit. 6. Here the future impairment was merely submitted as a factor in the consideration of permanent injuries. See Rauch v. McDonnell Aircraft Corp., Mo.App., 303 S.W. 2d 226, 238. This, however, would be more material on a contention of "double damages." Warning v. Thompson, Mo., 249 S.W.2d 335, 342, 30 A.L.R.2d 1176. We do not find the instruction erroneous.

■ It is next claimed that the court erred in failing to discharge the jury for improper argument of plaintiff's counsel. This necessitates a brief recital of the proceedings. In his opening argument plaintiff's counsel commented upon the complete absence of evidence from the defendant, except that of Watkins, whom he designated as a "pretty reliable nice guy," and he noted that defendant had produced no photographs and no evidence of any inspection. In defendant's argument its counsel early referred to plaintiff's counsel as "Dr. Orville Richardson, as they call him around the court." This caused an immediate repercussion, with objections and interjections, some of which were stricken. Defendant's counsel then proceeded to argue that by "exaggerated techniques" plaintiff's injuries had been built up beyond all reason (repeated later in varying wording) and that he, too, "would like to get a lot of money without working for it."

In his closing argument plaintiff's counsel said: " * * * I don't care what he says about me. I really don't care, because he talks about me as though I was some person trying to hoodwink you. Let me ask you something, do you think General Motors picks some kids to come into the courtroom? These boys know their way around. They know how to pronounce words. They know how to pronounce these words as well as I do. He wants to appear like some big fumbling person. He said we brought in everything we could and are we supposed to inspect these trucks and locks. They have got a big plant out there. They've got hundreds of people. Does he mean to say they have no money at all—". At this point an objection and a motion for mistrial were made; the objection was sustained, the jury was instructed to "disregard it," and the motion was overruled. The contention here is that the argument emphasized the "wealth" of defendant and was an appeal to prejudice. Then continuing, plaintiff's counsel renewed his argument concerning the absence of evidence and witnesses, spoke of the maligning of plaintiff and his counsel, and said: " * * Does that look like a buildup? If a man returns to work and makes some money and works as hard as he can for his wife and his family, is that a buildup?" A motion for mistrial was denied, out of the presence of the jury, following which counsel asked that the jury be instructed to disregard the remark concerning the wife and family. This was specifically done.

The statement concerning plaintiff's wife and family was improper; the prior statement about returning to work and working hard was a proper answer to the "build-up" argument, and perhaps the trial court felt that the remainder of the statement had been engendered by the heat of the answering argument. It would seem that counsel for defendant might well have expected some degree of retaliation from his own argument. The jury knew that plaintiff had a wife and that he had gone back to work. The effect of this argument was more apparent to the trial court than to us,

and the overruling of the motion was within the range of its discretion. Compare Tyler v. Kansas City Public Service Co., Mo.App., 256 S.W.2d 563, 565; Holtz v. Daniel Hamm Drayage Co., 357 Mo. 538, 209 S.W.2d 883, 885. The same is true of the argument about the plant, the "hundreds of people" and "money"; the latter part of that remark was somewhat peculiar, perhaps because counsel was not allowed to finish. The argument was apparently made as having some connection with a failure to inspect and the ability to inspect; it followed immediately after a reference to inspection. We find no abuse of discretion in overruling the motion made at that point.

■■■■ The next contention is of error in permitting the use of a blackboard by plaintiff's counsel during his argument, and the writing of figures thereon "Unsupported by Evidence," thereby misleading the jury. Objection was made in advance of the argument to the use of the blackboard; that was very properly overruled. There is no arbitrary rule against such use. We have no reproduction here of the figures or matter actually displayed; this, in itself, should generate some caution in the use of a blackboard rather than some other mode of display which could be preserved. In the course of the argument counsel referred to the retirement age of 65, saying that plaintiff (then 35) had "30 years to go." Objection was made that the retirement age was not in evidence; this was sustained. It appears, however, that counsel proceeded to put figures on the blackboard, including the "30 years," and he thus argued—"I say he's got 30 more years —* * * let's take a look into the next 30 years of his working life." From that point, he argued the past pain and suffering in days, the time in the hospital, and an assumed value for these; further, he argued the value of future pain for 30 years at an assumed value of $10,000 or 90 cents a day; these and other figures were presumably put on the blackboard. There were adequate objections which were overruled. We may say now that blackboards and other forms of visual display may not

be used with uninhibited freedom. Apparently the only Missouri case involving the matter is Boese v. Love, Mo., 300 S.W.2d 453; it was there held that charts, etc., which were not in evidence might be used to illustrate a point in argument *based on the evidence* if not so used as to be confusing or misleading (citing authority). There a diagram was used to illustrate counsel's argument concerning the positions of vehicles, distances, elapsed time, etc., all of which was presumably based upon the evidence. Inherent in that opinion is a caution against the use of these methods to mislead, or where their use is not fairly based upon the evidence. The primary contention here is that the graphic use of the "30 year" figure was improper and misleading, because not based upon the evidence. There was no evidence of plaintiff's expectancy. It is argued here by plaintiff that this court may take judicial notice of the mortality tables. It has been said that we may (Langan v. United States Life Insurance Co., Mo.App., 121 S.W.2d 268, 272; Selle v. Selle, 337 Mo. 1234, 88 S.W.2d 877), but may a jury do so? In a broad sense the term "judicial notice" is used to denote both judicial knowledge (which courts possess) and common knowledge (which every informed individual possesses); and matters of common knowledge may be declared applicable to the case without proof. Strain v. Isaacs, 59 Ohio App. 495, 18 N.E.2d 816, 825. And see Wolf v. Mallinckrodt Chemical Works, 336 Mo. 746, 81 S.W.2d 323, 332; 31 C.J.S. Evidence § 6, p. 509. The court here did not instruct on mortality tables, and it would be unrealistic to say that the jury actually knew plaintiff's expectancy. However, a jury would have actual knowledge, and common knowledge, that a person 35 years of age with no constitutional diseases or abnormalities might be expected to live for a substantial number of years, in the absence of unexpected calamity. The trial court apparently took that view and for that reason allowed considerable latitude. Counsel for plaintiff did qualify the assumed expectancy by stating that plaintiff might be run over and killed "tomorrow."

Counsel are sometimes permitted to comment on matters of common knowledge, though outside the record. 88 C.J.S. Trial § 181, p. 355. Here the argument was prolonged and made more graphic by the use of the blackboard. It would certainly have been preferable for counsel to have confined himself to the evidence. The question is close, but we have concluded that this should not work a reversal. This point has concerned the writer considerably.

The last point made is that the verdict is grossly excessive, despite the remittitur of $2,500. Defendant cites, principally, the recent case of Miller v. Multiplex Faucet Co., Mo., 315 S.W.2d 224. There a $15,000 judgment was reduced to $10,000 on appeal, for injuries somewhat analogous to those here; but the court apparently doubted the permanency of any substantial injury. Space will not permit us to contrast the cases more closely, or to discuss the other cases cited. They have all been considered. We shall not review again the evidence concerning plaintiff's injuries. There is some analogy between plaintiff's injuries and certain of the circumstances here, and those in the case of Kiger v. Terminal R. Ass'n, Mo., 311 S.W. 2d 5, where a $30,000 verdict was reduced by this court to $20,000. While we are never bound by the action of the trial court in requiring a remittitur, we are often reluctant to reduce a verdict further after that court has acted. Brandt v. Thompson, Mo., 252 S.W.2d 339, 342; Couch v. St. Louis Public Service Co., Mo.App., 173 S.W.2d 617, 626. The scope of review of verdicts by the trial and appellate courts is ably discussed in the case of Sanders v. Illinois Central R. Co., Banc, 364 Mo. 1010, 270 S.W.2d 731. Attending thereto, we look to see whether the evidence, considered in a light most favorable to the action of the trial court, affords reasonable and substantial support for the amount of the judgment and for the trial court's remittitur. We have concluded that it does. We have the feeling that the original verdict and the final judgment are both generous, but it is not our place to weigh the evidence or to substitute our judgment for that of court or jury. Our function is to determine the issue of excessiveness solely as a matter of law.

From all the foregoing, we find no reversible error. The judgment will be affirmed and it is so ordered.

STORCKMAN, P. J., and JAMES W. BROADDUS, Special Judge, concur.