**Lola B. COONS, Respondent,**

v.

**John W. FARRELL, d/b/a Moler Beauty School and Moler Barber School, Appellant.**

**No. 25028.**

Kansas City Court of Appeals.

Missouri.

Feb. 3, 1969.

John J. Alder, Wiley W. Morrison, R. Robert Cohn, James F. Stigall, Kansas City, for appellant.

McLaughlin & Vanet, W. Hugh McLaughlin, M. Randall Vanet, Kansas City, for respondent.

MAUGHMER, Commissioner.

This is a personal injury action against the owner of a student beauty shop for the alleged negligent application of a cold wave permanent. The verdict and judgment were for plaintiff in the sum of $5,-000.00. The defendant has appealed on the grounds that the trial court erred in denying defendant's motion for a directed verdict, in refusing to grant a new trial, in giving Instructions Numbered 3 and 6 and in allowing an excessive verdict to stand without ordering a remittitur.

The defendant, John W. Farrell, d/b/a Moler Beauty School and Moler Barber School is located in Clay County, Missouri, and is just what the name implies, that is, a school or training center for barbers and beauticians. A branch of this school was operated as the Antioch Shopping Beauty School. The beauty operator trainees learned in part through practical experience—by actually giving shampoos, rinses, hair sets and permanent waves. Because these beauty shop services were being done by students rather than by graduate and licensed operators the charges assessed for the work by these amateurs were substantially less than the going rate for professionals in the same field.

The plaintiff, Lola B. Coons, who in 1963 was 33 years of age, was a music teacher. She had taught in the Smithville High School but in 1963 was on the staff at Parkville as a substitute teacher. Mrs. Coons testified that at about 9 A.M. on January 8, 1963, she went to Mr. Farrell's shop in Antioch for a permanent. Mrs. Coons previously directed the high school Glee Club at Smithville and a former member of that organization was a student at Antioch and had solicited her patronage. The Glee Club acquaintance was not present when plaintiff arrived and a Mrs. Jean DeForest was assigned to her. Her hair was first shampooed, then waved and the curling lotion was put on. After this chemical curling lotion had been on for approximately 30 minutes, Mrs. DeForest tested one intended curl and found it to be perfectly straight. Mrs. Jackson, the supervisor, was called. She conferred with Mrs. DeForest. Then Mrs. DeForest "blotted" plaintiff's hair with a towel and reapplied more of the curling solution. Mrs. Coons said this second application was left on for nearly one whole hour; that Mrs. DeForest left in the meantime and a second student finished the work. Plaintiff was in the shop from about 9 A.M. to approximately 3:15 P.M. Plaintiff said her hair "started breaking off around the ears" two or three days later; that her hair was dry, "no life to it at all, no oil, just dry fuzz". After four or five weeks "my hair was coming out in splotches". Responding to an inquiry if she had lost all of her hair, plaintiff said, "Yes, until my head was just like your face".

Mrs. Coons said she visited and called defendant's school in regard to her difficulties several times, that finally she saw Mrs. Farrell and was told that her loss of hair was caused by some disease or organic deficiency and not as a result of the Bonat Rio permanent wave application of January 8, 1963. Mrs. Coons then visited Doctor Hodge, a general practitioner, and had a thorough physical examination. Doctor Hodge found nothing that in his opinion could have caused the loss of hair. On February 14, 1963, she was examined by Dr. Harry R. Staley, a Dermatologist, with the same result. Finally, defendant furnished plaintiff with a wig, in fact, with three wigs, neither of which proved fully satisfactory. By early March, 1963, Mrs. Coons had lost all of her hair. She said it started growing back in the fall of 1963, "it was fuzzy, just like baby fuzz and baby fine and it was white when it first came in and then after it got a little length to it, it was curly. It was strange stuff but it was hair, it was welcome." Plaintiff said when the hair was falling out she ran a temperature, was nauseated, had lumps on her

head which when pressed would "ooze clear liquid stuff of some nature". She said that in the fall of 1963 her hair had grown out sufficiently for her to go out without embarrassment. She claimed no permanent hair damage.

Doctor Hodge's charges totalled $54.50 and Doctor Staley's $66.00. Mrs. Coons said she spent $49.50 for drugs and $67.50 for cleaning and setting each of the three wigs. She paid $2.95 for this Bonat Rio permanent which, of course, is only a small percentage of the charge for a permanent at a professional beauty salon.

Dr. Harry R. Staley, Dermatologist, Kansas City, Missouri, first saw the plaintiff on February 14, 1963. He found large patches of loss of hair. The remaining hair was dry, lusterless, brittle and the ends split. He prescribed shampoos and rinses with vinegar and oil—also gave her Oscal, a calcium made from oyster shell with vitamins. His diagnosis was "Loss of hair of scalp, due to too long an exposure to wave solution". Doctor Staley was a treating physician and as such could consider the patient's complaints and history as recited by her. Doctor Staley also found oozing in the scalp. He stated that the normal time to leave the chemical solution for a permanent on the hair is from five to ten minutes, and that if it is left on too long it will "dissolve the hair". He said it was not unusual for the pain and ill effects not to show up for three or four days, said it was like exposure to poison ivy where you break out a few days after having been exposed.

Mr. Don Hill, a self-employed and licensed cosmetologist, testified on behalf of plaintiff. He said he had given her numerous cold wave permanents with no harmful results. He said the wave solution used in giving permanents is an acid which heats the hair; that he has used Bonat Rio; that in doing the curling process, the solution is properly left on about ten minutes and then the hair is rinsed. He said that women's hair react different-

ly, that some hair will curl more quickly than others and that the operator should check frequently—every few minutes—and when the hair starts to curl the solution should be removed.

The defendant's responses to written interrogatories included:

1. An admission that John Wilson Farrell was the sole owner of the Moler School.

2. That the school was, on January 8, 1963, managed by Mrs. Florence Jackson.

3. That a Mrs. Jean DeForest performed services upon the plaintiff on January 8, 1963, and on that date gave her a Bonat Rio permanent.

4. The duties of Mrs. Jackson, manager and supervisor, were to "supervise the conduct of the school and see that the student had proper training, see that the customers were properly served".

Mrs. Jean DeForest was a student trainee. She was paid no compensation but she paid defendant for her schooling or training.

Mrs. Florence Jackson testified on behalf of defendant. She said that she was acting as manager and instructor in defendant's school on January 8, 1963, knew Mrs. Coons and was "familiar with that situation". In describing the process of giving a permanent at the school, Mrs. Jackson said the hair is first shampooed, then cut to the style desired, next the hair is "blocked off" and next the curling lotion is applied. Its effect is tested every three or four minutes to see if the hair has curled. She said the curling lotion should be applied "sparingly". Mrs. Jackson said plaintiff's hair was hard to curl and they "applied a new bottle" and then we "came up with a curl". She stated that many customers required 25 or 30 minutes for the hair to curl, that plaintiff's hair was not properly curled after 25 or 30 minutes and so the student put on some more lo-

tion. This witness recalled that Mrs. Coons returned three or four days later. She said that on that occasion her scalp was dry and she was given a shampoo and an oil treatment. Mrs. Jackson expressed her opinion that leaving the Bonat Rio curling solution on the hair for as long as 1½ hours would not "damage" the hair or cause it to come out.

Mrs. Jean DeForest, at the time of the trial a secretary and housewife, testified. She said she did not actually remember giving Mrs. Coons a permanent but admitted that she was a student at defendant's school on January 8, 1963. She said she often left the curling lotion on for as much as 30 minutes but that at the school an instructor was normally called every three or four minutes to check the hair and see if it had curled. Mrs. DeForest graduated from the school and worked professionally as a beauty operator for a little less than two years after which she returned to her former occupation as secretary. She stated that she did not like anything about the beauty shop business.

Mrs. Ann Farrell, wife of defendant, said that on January 8, 1963, she was the manager and overseer of defendant's beauty schools but that Mrs. Jackson was the direct manager of the Antioch school. She identified a sign which was required to be placed outside the premises which stated that all the work was done by students. She said there was no warning on the Bonat Rio bottle that it should be "left on" only for a limited time. She expressed her opinion that leaving a waving solution on the hair for "too long" would not cause loss of hair.

Dr. Richard L. Sutton, a Dermatologist of wide training, experience and some attainments as an author, was called by the defendant. He examined Mrs. Coons at his offices in Kansas City, Missouri, on July 20, 1967, for the purpose of testifying in this lawsuit. He read into evidence a letter which he had prepared reciting his findings. Therein he set forth quite fully the history of the case as it had been given to him by Mrs. Coons. We quote therefrom:

"She described her experience of January, 1963 when a permanent wave procedure was followed, after a few days by progressive baldness which eventuated after 6 or 8 weeks in total baldness and while the hair was falling out there were left tufts over the scalp. She was completely bald, so that the scalp remained as smooth as her cheeks, as she described it, for several weeks and under medical care her hair began to grow. She lost hair only from the scalp, not from the eyebrow, eyelashes, under the arms or elsewhere. When hair reappeared, it grew as a whitish, frosted, like baby fuzz, she said, which eventually, over a period of time grew into normal hair and resumed practically its original color and texture, but this took time. She was under Doctor Staley's care for several months in 1963. She described his treatment to me as consisting in patient waiting and the administration of calcium and vitamins. She described an episode of soreness of the scalp which came on some while after the baldness had appeared. This was a brief period in which there were tender sores on the scalp with some fever and some discharge from the lesions. Doctor Staley's salve cured this quickly.

"My examination on this date gave no indication of past disease. Her scalp and hair, her nails, which are very similar to hair in structure and composition, the visible skin with her clothing on seemed to be normal."

Doctor Sutton expressed the opinion that Mrs. Coons had described a condition known as allopecia areata, a disease of unknown origin which causes the hair to fall out. He said that in injuries from permanent waves and injuries from permanent waving processes the hair breaks off, becomes dry and brittle but the roots are not damaged and the patient does not become actually bald. He examined pictures of

plaintiff taken at various periods of her difficulty, which were exhibits in the case, and said they appeared to be classic examples of allopecia areata. It might here be observed that Mrs. Coons' hair did grow out and apparently the roots were not injured. The doctor said this was usually the situation where there had been damage in applying the curling process.

■ On appeal defendant says the court erred in denying the motion for a directed verdict. Defendant complains at length that Dr. Harry R. Staley was permitted to testify to the "history of events". Doctor Staley was a treating physician. As such it was permissible and proper for him to consider the history in determining his diagnosis and prescribing treatment. Doctor Staley stated his belief that plaintiff's loss of hair and her scalp difficulties were caused by the curling solution being left on for too long a period. His knowledge that such a solution had been applied, of course, came from the plaintiff and his answer was in part based thereon but was, in effect, similar to a response to a hypothetical question wherein such fact had been assumed. Moreover, the defendant had his own witness, Doctor Sutton, recite plaintiff's history of the occurrence as she gave it to him in 1967, which was exactly the same account of the incident as she gave to Doctor Staley and which he testified about. Thus defendant put this history into evidence, and therefore he cannot claim injury by reason of its being before the jury. The point is ruled against appellant.

■ Defendant says that Doctor Staley and Cosmetologist Hill were not competent to express their expert opinions that leaving the curling solution on plaintiff's hair for as long as 1½ hours was "too long". Doctor Staley qualified as a physician and Don Hill as a duly trained, licensed and experienced cosmetologist. It was not error to receive their opinions as so expressed. The assignment is without merit.

Defendant asserts further in support of his motion for a directed verdict that plaintiff's evidence is properly described as "scintilla" rather than substantial. As to this assignment it might be appropriate for us to quote briefly from the recent opinion in Epps v. Ragsdale, Mo.App., 429 S.W.2d 798, 800, 801. There the plaintiff had suffered scalp burns and loss of hair after she got a permanent wave at defendants shop. That case was submitted under the res ipsa doctrine while the instant case was submitted on specific negligence—leaving the solution on for an excessive period. However, the comments of the court are pertinent, we think. The court said:

> "Courts have said, on different but similar facts, that permanent waves do not ordinarily cause scalp burns and hair loss when carefully applied by a beautician. * * * It is common knowledge that many women have permanent wave treatments without damage to their scalps or hair; it is also commonly known that human hair and scalp are sensitive to caustic compounds and to heat. These two commonly known facts lead to a third: permanent wave treatments do not ordinarily cause scalp burns and hair loss of the severity shown here if carefully performed by a beautician."

■ We have set forth the evidence rather fully in this opinion. It is not necessary to restate it in whole or in part. In our judgment plaintiff's cause of action is supported by substantial evidence, which evidence if believed would support a verdict. The jury did believe it and it is sufficient.

Instruction No. 3 is as follows:

"Your verdict must be for plaintiff if you believe

"FIRST, student operator, Jean DeForest was performing services in defendant's beauty school within the course and scope of her agency for defendant at the time of the occurrence mentioned in the evidence, and

"SECOND, Jean DeForest left the waving solution on plaintiff's hair too great a length of time, and

"THIRD, Jean DeForest was thereby negligent, and

"FOURTH, as a direct result of such negligence the plaintiff sustained damage."

Appellant says the instruction is erroneous because there was no competent and substantial evidence justifying even submitting the question of agency to the jury. Appellant invites our attention to the following from the case of Roy v. Tinsley, Mo.App., 355 S.W.2d 621, 623:

"Under the law there is no presumption of agency and the burden of establishing it is on the party by whom it is alleged to exist."

In this same case the court quoted with approval the following from 2 Am.Jur., p. 13 on Agency:

"An agency may be defined as a contract either express or implied upon a consideration, or a gratuitous undertaking, by which one of the parties confides to the other the management of some business to be transacted in his name or on his account, and by which that other assumes to do the business and render an account of it. This is comparable with the definition of agency as adopted by the American Law Institute. That definition is as follows: 'Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.' "

We again refer to and quote from Epps v. Ragsdale, supra, 429 S.W.2d at page 802:

"In view of defendant's admission that his operator did give plaintiff the permanent wave, it would suffice to hypothesize: that defendant's operator had management and control of the materials and equipment used in giving plaintiff her permanent wave, that in doing so plaintiff's hair and scalp were injured, that such injuries were the direct result of the operator's negligence, and that as a direct result of such negligence the plaintiff sustained damage."

■ In the answers to written interrogatories in the case before us defendant admitted ownership and operation of the school, that Jean DeForest performed the services of January 8, 1963 upon the plaintiff and that at the time Mrs. DeForest was a student trainee who had paid defendant for such training and that she was working under the direction of defendant's supervisor, Mrs. Jackson. There was ample evidence that Mrs. DeForest at the time was acting as the agent and representative of defendant.

Instruction No. 6 tells the jury that acts allegedly performed herein were within the "scope and course of agency" if "they were performed by student operator, Jean DeForest, to serve the interests of defendant according to an express or implied agreement with defendant and defendant either controlled or had the right to control the physical conduct of said student operator". We have considered the objections of appellant to this instruction and believe the same are properly described as vague and indefinite rather than clear and definite. We see no error in the instruction.

■ Finally, defendant insists that the verdict is excessive, the result of bias and prejudice and a remittitur should be ordered. The plaintiff's expenditures for medical assistance, drugs and servicing of three wigs total $236.50. At the time of her disability she was not regularly employed but rather was on call as a substitute music teacher with wages when substituting of $18.00 per day. It is not shown with any degree of definiteness how often she might have been called had she been available. Her wage loss, if any, under the evidence was problematical. However,

plaintiff was humiliated and embarrassed from early in January, 1963, until the fall of that year—a period of approximately ten months, during probably six or seven months of which she was almost entirely bald. This is not only humiliating and embarrassing but we believe rather irritating, especially for a woman.

In support of a remittitur defendant cites Moore v. Glasgow, Mo.App., 366 S. W.2d 475, where plaintiff suffered head lacerations and leg bruises in an automobile accident. The verdict was for $3,700.00 and the trial court held it was excessive by $1,200.00. There the plaintiff was only disabled for a short period of time and the remittitur was ordered by the trial court not by an appellate court. It is the province of the jury in the first instance to assess the amount of damages (Spica v. McDonald, Mo., 334 S.W.2d 365, 368) and such award should not be set aside lightly or capriciously. Lindsey v. Williams, Mo., 260 S.W.2d 472, 478. However, the trial court is vested with wide discretion in ordering a new trial on the amount of the verdict, Combs v. Combs, Mo., 295 S.W.2d 78, 80. There is no precise formula for gauging whether a verdict is excessive but each case depends upon its own facts. The award must be what will fairly and reasonably compensate a plaintiff for the injuries and damages sustained. In Salzwedel v. Vassil, Mo.App., 351 S.W.2d 829, 836, the court said:

> "The amount of damages for personal injuries is primarily the jury's function and prerogative, and upon appeal, the appellate court pays deference to the trial court's action in seriously considering and passing upon excessiveness or inadequacy of verdicts and is reluctant to disturb judgment or require remittitur."

In the case before us the jury allowed $5,000.00. The trial court refused to disturb the verdict or reduce the amount. We are unwilling to say on appeal that the amount is excessive and that a remittitur is required. There is no real contention that bias and prejudice existed except as it might stem from the amount of the allowance.

We believe plaintiff made a submissible case and that the verdict and judgment are supported by substantial evidence. We find no reversible error and the judgment is affirmed.

SPERRY, C., concurs.

PER CURIAM:

The foregoing opinion of MAUGHMER, C., is adopted as the opinion of the Court.

All concur.